### SCANLAN v. METROPOLITAN LIFE INS. CO.

### No. 6200.

Circuit Court of Appeals, Seventh Circuit.

Nov. 30, 1937.

---

Nathaniel Rubinkam and William S. Allen, both of Chicago, Ill., for appellant.

Earl K. Schiek, of Chicago, Ill., for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Daniel J. Scanlan, a restaurant keeper, on September 19, 1929, took out an accident insurance policy with defendant which ran for a term of six months. It was renewed each successive six months and was in force on November 22, 1935, when the insured died from an asserted accidental cause.

Defendant offers two defenses. One would reduce its liability from $5000 to $2000. The other defense, if successful, would defeat all recovery. It is based on a provision of the policy which excepted liability if death were caused wholly or partly by bodily infirmity. Defendant moved for a directed verdict at the close of the trial. Its denial is the basis of the assignment which raises this second defense.

The employment of the insured was changed from restaurant proprietor to that of bridge tender during the life of the policy without any increase in premium. The former employment was classified by defendant, so it here asserts, as an "ordinary" risk and the latter as a "medium" risk. Under the medium risk the maximum insurance coverage was two thousand dollars.

The second defense rests upon the evidence which allegedly showed death was caused in part by bodily infirmity. On No-

944

vember 7, 1935, the insured was driving his automobile in the city of Chicago about 7:50 o'clock in the evening. His car collided with another motor vehicle at a street intersection, and he was injured. The seventh and eighth ribs on the left side were broken at a point in line with the arm pit. There was also a bruise on the inner part of the upper portion of the left leg and a wound on the left knee. The bruise was black and blue and "about the size of the palm of the hand." The patient was afflicted with varicose veins in the area of the bruised portion of the left leg. The patient had the services of a doctor and also had a competent nurse. On the fifth day after the accident, the injured portion of the left leg became inflamed and ice packs were placed thereon. By the nineteenth of November, the inflammation and soreness had subsided, and the condition remained without much change until his death on the twenty-second. The nurse who attended him stated that at or about two A. M. the patient called for a drink of water. She observed that he was gasping for breath and after he drank the water his gasping became worse. She took his pulse only to find it had ceased beating, and she immediately gave him a heart stimulant. His gasping continued until he died about fifteen minutes later.

The autopsy and post mortem participated in by two physicians disclosed the broken ribs and in the lower portion of the left lung there was a consolidated area which in the opinion of Doctor H. could be caused either by pneumonia or a blood clot. The first possible cause was rejected because of the absence of other symptoms which are almost always present in pneumonia cases.

In the bruised area of the left leg near the enlarged varicose vein there was found a blood clot or thrombus. The blood clot was removed. "It was a rather slippery formation which filled the blood vein like a cast fills a mold." No other blood clots were found. One end of the blood clot was tapered off in a smooth fashion and the other end terminated abruptly and showed rough edges indicating that there may have been more of it at one time and that end portion was missing. One doctor gave his opinion to the effect that an incomplete thrombus like this indicates that one end was missing and had been carried to a new location in the body. In his opin-

ion the cause of Scanlan's death was a breaking off of a portion of this blood clot. The clot passed along the veins of the leg and was transported into the various veins which finally empty into the vena cava inferior, entering the heart at the right atrium or ante-chamber of the heart, going into the right chamber proper, from which right chamber it was transported into the pulmonary artery and then into the lung where it became stuck.

■ (a) We must reject defendant's effort to reduce its liability on account of insured's alleged change to a more hazardous occupation for two reasons. In the first place, the evidence fails to show that the statement or classification of risks in force at the time this policy was issued made bridge tending a more hazardous one than conducting a restaurant. There was filed with the state official a classification bearing date September, 1921. There was also evidence to the effect that the classifications therein appearing were changed in various respects before 1929. There was no competent evidence which showed that defendant's classification of risks in September, 1929, placed bridge tending in a more hazardous classification from that of a restauranteur.

Another reason, equally strong, seems to prevent the application of this defense. The accident did not occur while insured was engaged in his occupation of bridge tending. He was riding around the city in his car about four hours after the day's work was over when the accident occurred.

The policy provided:

"1. This policy includes the endorsements and attached papers, if any, and contains the entire contract of insurance except as it may be modified by the Company's classification of risks and premium rates in the event that the insured is injured after having changed his occupation to one classified by the Company as more hazardous than that stated in the policy, or while he is doing any act or thing pertaining to any occupation so classified, *except ordinary duties about his residence or while engaged in recreation, in which event* the Company will pay only such portion of the indemnities provided in the policy as the premium paid would have purchased at the rate but within the limits so fixed by the Company for such more hazardous occupation."

We are clearly satisfied that the words "in which event" refer to the classification of occupation by the company as more hazardous and do not include the exception which covers "ordinary duties about his residence *or while* engaged in recreation." Friend v. Business Men's Assur. Co., 141 Kan. 470, 41 P.(2d) 759, 760; Business Men's Assur. Co. v. Bradley (Tex.Civ.App.) 275 S.W. 622; Thorne v. Aetna Life Ins. Co., 155 Minn. 271, 193 N.W. 463.

There is more doubt about the question of fact, namely, whether the insured was engaged in a recreation, than over the meaning and effect of the exception in case he was engaged in recreation. The plaintiff left his work and place of employment some four hours before the accident. He drove a fellow workman home and was at the time of the accident driving home, evidently "doing" some errands in the meantime. The most favorable view we can give to this evidence is to say a jury question was presented as to whether the facts show the plaintiff to have been "engaged in recreation," when the accident occurred. This inquiry gives rise to the question, What was his occupation at the moment if he were not "engaged in recreation"?

Defendant raised this question by a motion to direct a verdict. The motion was properly denied.

(b) Defendant's second defense, which goes to the merits of the controversy, is based upon clause 9 of the policy which, eliminating unimportant words and clauses, reads as follows:

"Clause 9. This insurance shall not * * * cover accident, injury, disability, death or any other loss caused wholly or partly, directly or indirectly, *by disease or bodily or mental infirmity or medical or surgical treatment therefor;* nor shall it cover * * death * * caused wholly or partly, directly or indirectly, by ptomaines or disease germs or any kind of infection, whether introduced or contracted accidentally or otherwise (excepting only septic infection of and through a visible wound caused directly and independently of all other causes by violent and accidental means); nor shall it cover hernia of any kind, * * *."

The precise question presented is: Was Scanlan's death caused partially by his bodily infirmity?

The evidence disclosed that the deceased had varicose veins in his injured leg before the accident, and that varicose veins are a bodily infirmity as that expression is used in the policy. We are not convinced that all varicose veins are, as a matter of law, bodily infirmities, but in the instant case we will avoid argument by assuming that the enlarged veins of the deceased were a bodily infirmity.

The medical experts, three in number, testified at length upon thrombus, thrombosis, and embolism and the nature of varicose veins and as a cause of thrombus. The conclusion of one such doctor was "I believe if the injury had not been there and that vein had not been damaged, the likelihood of the thrombus forming would have been very remote." Another witness said, "My opinion is that a varicose condition is predisposed to trauma and that injury may set up a thrombus in that leg." "I have had occasion to find thrombosis where there was no varicose veins." Another witness testified that a blood clot is formed in different ways, one being "an injury that damages the wall of the blood vessel." The examining physician said that in his opinion the thrombus did not exist in the leg at the time of his first examination following the accident. Said he, "I believe the bruise is a causative factor of the thrombus because a damaged blood vessel is cause one for blood clot formation."

The most defendant could ask the court to do upon this evidence was to submit the case to the jury, which was done. Plaintiff might well have argued that the probability of varicose veins as a cause of death, as that term is properly used in insurance law, was so remote and speculative that a court must seriously consider the necessity of directing the jury to find for plaintiff.

There are two facts which are significant and not disputed. *First, there was no thrombus in the varicose vein or that area before the accident.* Second, there was only a possibility of a thrombus occurring in the varicose vein in the absence of the injuries sustained. In short, *the injury must have caused the thrombus to form in or near the varicose vein.*

While the bodily infirmity need not be the sole cause of the death to defeat recovery under this policy, it is well settled

946

that the "cause" as here used, either sole or partial, refers to something different than a disease or affliction rendered more serious by the consequences of the accident.

One may recover on an accident policy such as here in issue although the insured suffers from bodily infirmities. If the accident brought about conditions from which death resulted, the fact that the insured was ill, aged or infirm, or had bodily or mental infirmities, would not bar recovery provided the accident excited the bodily infirmity into activity and death resulted. If the infirmity alone would not have caused death, it cannot be said to have caused death when the immediate result was occasioned by an infirmity which became active only because of the accident. The infirmity may have made the insured less able to resist, but if the accident caused the condition which in turn affected the weak spot which did not resist as well as a healthy body, the cause is nevertheless the accident, and recovery cannot be avoided or evaded. Pacific Mutual Life Ins. Co. v. Meldrim, 24 Ga.App. 487, 101 S.E. 305; Wachtel v. Equitable Life Assur. Soc., 241 App.Div. 172, 271 N.Y.S. 650; Equitable Life Assur. Soc. v. Gratiot, 45 Wyo. 1, 14 P.(2d) 438, 82 A.L.R. 1397; Lewis v. Ocean Acc. & Guar. Corp. Ltd., 224 N.Y. 18, 120 N.E. 56, 7 A.L.R. 1129; Bohaker v. Travelers' Insurance Co., 215 Mass. 32, 102 N.E. 342, 46 L.R.A.(N.S.) 543; Meyer v. Fidelity & Casualty Co., 96 Iowa 378, 65 N.W. 328, 59 Am.St.Rep. 374; Rowden v. Travelers Protective Ass'n, 201 Ill.App. 295; Prehn v. Metropolitan Life Ins. Co., 267 Ill.App. 190; Horrie v. Industrial Casualty Ins. Co., 272 Ill.App. 252; Manufacturers' Acc. Ind. Co. v. Dorgan (C.C.A.) 58 F. 945, 22 L.R.A. 620; United States Fidelity & Guar. Co. v. Blum (C.C.A.) 270 F. 946; Fairclough v. Fidelity & Casualty Co., 54 App.D.C. 286, 297 F. 681.

Our conclusion is that in an action on an accident insurance policy to recover for the death of the insured, testimony to the effect that the results which followed the injury as its necessary consequences, and which would not have taken place had it not been for the injury, caused the death of the insured, is sufficient to support a verdict that the injury was the proximate and sole cause of the death.

The judgment is affirmed.