# BANKERS LIFE CO. v. NELSON

(No. 2160; December 31, 1940; 108 Pac. (2d) 584)

244

For the plaintiff in error, there was a brief by *Hagens & Wehrli* of Casper, and oral argument by *G. R. Hagens.*

For the defendant in error, there was a brief and oral argument by *R. R. Rose* of Casper.

RINER, Chief Justice.

This proceeding in error was brought by the unsuccessful party below to review a judgment of the district court of Natrona County in favor of the plaintiff in an action wherein May M. Nelson was plaintiff and

the Bankers Life Company, a corporation, was defendant. For brevity's sake the parties will be hereinafter referred to as aligned in the trial court or by their respective names. The trial was conducted in the court aforesaid with a jury in attendance and that body rendered a verdict upon which the judgment in question was based.

In view of the points argued here, the facts and proofs which may properly be recited and considered at this time and which were before the district court are substantially as hereinafter detailed. These points involve the liability of the defendant upon a life insurance policy issued upon the life of plaintiff's husband, George Nelson, and containing a so-called "double indemnity" provision in that instrument operative in favor of the plaintiff under certain circumstances. These pertinent double indemnity clauses of the policy read as follows:

"Upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, * * * * the Bankers Life Company agrees to pay double the amount called for in the first paragraph, Page 1 of this Policy.

"This Double Indemnity Benefit will not apply if the Insured's death resulted from * * * * physical or mental infirmity, or directly or indirectly from disease of any kind."

George Nelson was employed by an oil company to run a twenty-five horse power gas engine, which operated a pump in connection with the extraction of crude oil from oil wells. This engine was a two cycle device, i. e., it fired every other stroke and in order to start it, the large flywheel thereon had to be rocked back and forth by the employee in charge until the ignition spark caught the gas used for engine fuel and caused the machine to function. This starting operation was

not easy, due to the effort required to move the large flywheel back and forth, and in cold weather especially the task was frequently an extremely difficult one. The operator was obliged to use both his hands and feet to rock the wheel back and forth, which was done, as one witness explained, "by climbing on the spokes on either side of the flywheel," and that in cold weather "if real lucky" he could get it going in ten minutes; other times it would take an hour.

In the course of plaintiff's testimony, on direct examination, she stated in substance that she and her husband lived in a house very close to the pump-house where the engine was located—something like a hundred feet distant; that previous to December 14, 1938, Nelson had always had excellent health and was a strong, robust man; that on the date last mentioned the weather was quite cold and there was no fire in the engine-house; that on that date the timing gear that caused the engine to fire was worn and that in consequence the machine would kick back when her husband was not expecting it and it was very dangerous to start operating; that he usually worked eight hours commencing about seven o'clock in the morning, but on December 14, 1938, he worked over time in his efforts to start and keep the engine going; that he finally came to the house after four P. M., removed some of his clothing, saying "I believe I have ruptured myself on that engine"; that he showed her the rupture; that she saw it as a raised spot on the left side of his abdomen "about half the size of a walnut"; that until that time there was no hernia there and that her husband never wore a truss.

On cross-examination she stated among other things that she "based" her "version of the matter" on what she could see and "it hurting him after he got it"; that the engine was not operating properly on the 14th day of December, 1938; that he, Nelson, had been having

trouble with the device all that day; that she went to the engine house two or three times during the course of the day to find out what the trouble was—"why it was stopping so often"; that Nelson came home "just as soon as he found this hurt in there."

On her first recall direct examination she also stated that on December 14, 1938, she heard the sounds of the engine adjacent to the home residence; that she heard it back-fire "with a terrible puff," and that she could "hear it as long as it continued to sputter and cough"; that when Nelson came to the house immediately after, he was holding his left side with his hand and that at that time he went to the bedroom, opened his clothes and she saw the hernia. Upon cross-examination upon this recall she said that the hernia she then saw was a raised spot on his left side; that he was lying more or less on his back; that he usually quit work by three o'clock in the afternoon, but due to the excessive engine trouble, he worked late on the 14th of December, aforesaid.

On her second recall direct examination plaintiff also said that the sounds of the engine discontinued just before her husband came to the house after four o'clock in the afternoon; that he came to the house about a minute after the sounds of the engine ceased; that it was so near the house that he came right in; that she could hear from the house the sounds of the engine so that she knew whether it was running or not; that the time she was speaking of was when her husband "came into the house holding his side and went into the bedroom and showed" her "his side."

She subsequently testified in the course of her examination upon this recall that Nelson would get the engine running for half an hour and then it would sputter, stop and start again; that this happened several times during the course of the morning of the 14th of December, 1938; that the reason it sputtered that day

was on account of both the cold weather and some apparatus on the engine that made it fire at the wrong time, and that the engine was always stopped in its operation for overnight.

It appears that George Nelson was examined by a chiropractor on December 22, 1938, who found that he had a hernia and advised him to report this condition immediately to the company for whom he worked and that the company would undoubtedly arrange for an operation. Nelson went to Dr. McClellan of Casper, Wyoming, about December 24, 1938, who examined him physically, determined that he was suffering from a hernia and recommended that an operation be performed to remedy the disability. Plaintiff's husband entered a Casper hospital pursuant to such recommendation on December 26, 1938, and an operation was next morning performed. A local anaesthetic was used. It is a conceded fact in the case that an operation of this kind was proper medical treatment for such an ailment.

On January 11, 1939, Nelson had been up the day before and had been asked to arrange for some one to get him and take him home, the post-operative history of his case being not unusual and so far as could be told the result obtained satisfactory. Dr. McClellan had made his usual morning hospital rounds when he was called back to Nelson's room and found the latter was in bed suffering from heart trouble. His death occurred shortly thereafter. A post-mortem examination of the body disclosed that the immediate cause of George Nelson's death was acute dilatation of the right side of the heart.

Dr. Stuckenhoff, as a witness for the plaintiff stated, in the course of his testimony, in substance that the thinness of the right heart muscle in Nelson's body was a latent and dormant condition which had existed for some time previously; that the dilatation of the heart

muscle, which was the immediate cause of the death, occurred but a very short time before that event; that a surgical operation places an added burden upon the heart; that in the absence of some stress or strain that might have been experienced by Nelson he might have lived for a considerable period of time; that Nelson had healed quite well from the operation.

On motion made by the defendant at the close of plaintiff's case the court ruled declining to strike out as hearsay plaintiff's testimony that her husband told her that "I believe I have ruptured myself on that engine," and holding under the circumstances proven that that statement was a part of the res gestae.

Dr. McClellan, testifying as a witness for the defendant, gave it as his opinion that George Nelson had a congenital hernia; that practically all hernias are congenital; that throughout the life of a person who has such a condition this is equivalent to saying that there was a potential hernia, i. e., not an actual one but a condition that might at any time develop into one; that his preoperative examination of the man indicated that Nelson had a normal heart and blood pressure; that the thinness of the heart wall might have been congenital, and that this thinness of the heart muscle presented a condition "something like an aneurysm." Dr. Riach, also a witness for the defendant, who had assisted in the operation aforesaid and who was present at the autopsy, stated that the examination made then disclosed that Nelson had had a potential hernia.

It is contended for the defendant that under the terms of the insurance policy, reading, "This double indemnity benefit will not apply if the insured's death resulted from * * * * physical or mental infirmity, or directly or indirectly from disease of any kind," the burden of establishing this exception rested upon the plaintiff and not upon the defendant. Cases are cited

to sustain this contention. On the other hand the plaintiff refers us to Joyce on the Law of Insurance, Second Edition, Volume 5, Section 3796a, where it is said that:

"If a risk is excepted by the terms of a policy which insures against other perils or hazards such exemption from liability constitutes a defense which the insurer may urge, for it has not assumed that particular risk or risks and the burden rests upon insurer if it intends to take advantage of such exemption, so that it must allege and prove that the loss or a part thereof fell within the same. * * * * So the burden is upon insurer to allege and prove that insured's death resulted from an excepted cause and within the time to which such exception is limited."

To this statement there might be added that of 8 Couch's Cyclopedia of Insurance Law, Section 2217, Page 7173, reading:

"The apparent weight of authority is to the effect that where the undertaking is to pay in case of the death of or injury to the insured effected through external, violent, and accidental means, etc., provided the death or injury shall not have been produced by any of the various acts or causes specifically enumerated in the policy, the burden or proof that the death or the injury was caused by one of the excepted causes must be assumed and borne by the insurer, after the plaintiff has established the fact that the death or injury was the result of accident or accidental means. So, in an action to recover upon a policy of insurance against death from an accidental cause, the burden of proof is upon the plaintiff to show that death resulted from such cause, and until this is established no case is made out, but, if plaintiff has introduced evidence showing death to have been the result of an accident, the burden of proof is then on the insurer to establish a defense that the loss was within some exception of the policy. Similarly, the burden is upon the insurer to allege and prove that insured's death resulted from an excepted cause."

However, we are inclined to think that all that need

be said regarding the point is that if the plaintiff has proven affirmatively to the satisfaction of the jury or judge trying the factual side of a case that the death was due to a "bodily injury effected solely through etxernal, violent, and accidental cause," as required by the insurance policy here involved, that then it is not necessary for the plaintiff to go further and prove a negative, i. e., that the death did not result from some other cause, for example, as in the case at bar, "from physical or mental infirmity, or directly or indirectly from disease of any kind." This being so, the question whether George Nelson's statement to his wife that, "I believe I have ruptured myself on that engine," was admissible as a part of the res gestae, as the district court ruled, is of paramount importance.

10 Ruling Case Law 978, Section 161, says:

"In order to constitute declarations a part of the res gestae, it is not necessary that they shall have been precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, tend to explain it, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence."

Jones' Commentaries on Evidence, Volume 3, 2nd Edition, Section 1203, Pages 2207-2208, discussing the same subject, declares that:

"The present attitude of the courts, it may be said, is to regard primarily the circumstances. Although it appears that the particular declarations, exclamations, or statements were made after the occurrence in question, if it also appears that the principal occurrence was such as would be likely to cause more than passing mental effect, and that the conduct of declarant was such as to show that its effect still continued as to him, and the declaration is relevant and relates to the occurrence, it is admissible."

Mr. Wigmore in his able work on the Law of Evi-

dence, Volume 6, 3rd Edition, Section 1746, Pages 134-135, discussing statements made after an injury occurs as exceptions to the rule regarding hearsay statements, remarks:

"The typical case presented is a statement or exclamation, by a participant, immediately after an injury, declaring the circumstances of the injury, or by a person present at an affray, a railroad collision, or other exciting occasion, asserting the circumstances of it as observed by him. * * * *

"Since the Courts actually do admit a class of statements to which the prohibition of the Hearsay rule applies—since we must shape our treatment of the law of Evidence by what the Courts do, and not by what they say, the time seems to have come to call these doings by their true name,—in other words, to recognize the existence of this Exception to the Hearsay rule. The limits of the Exception may be elusive and the practice in different courts may vary. But that the core and substance of such an exception is universally accepted cannot be open to doubt."

The same learned author quite accurately condensing the views of a number of reputable appellate courts, and which are cited, has quite appropriately phrased the principle upon which such statements are admitted in courts of justice as follows (Section 1747 of the work above cited, Page 135):

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing

the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts."

Under these authorities and the cases listed by them we readily conclude that the ruling of the district court regarding Nelson's statement aforesaid to his wife was correct. The man was not talking about the fact of injury with the idea of building up a case under the life insurance policy. That was something which undoubtedly at that time never entered his mind. The facts of the injury were talking through him as we view it and not he concerning the facts. He was worried over what had just happened to him and it was of such a nature as to still his reflective faculties and remove their control as Mr. Wigmore so clearly puts it.

We are unable to agree that, as argued by the defendant, "The only evidence we have in the case to show that the decedent was injured 'through external, violent and accidental means' is contained in the testimony of the plaintiff who, over objection of the defendant, was permitted to say that the decedent, on December 14th, 1938, at about four or four-thirty o'clock in the afternoon, after his day's work was over and after the engine on which he had been working had been stopped for the night, and after decedent came in the house he said: 'I believe I have ruptured myself on that engine.' " On the contrary we think the facts and testimony recited above and the fair inferences which the jury might properly deduce therefrom afforded sufficient evidence that George Nelson's death was proximately due to a "bodily injury effected solely through accidental cause," i. e., a hernia caused by the pump engine and due to Nelson's struggle to keep the machine going under adverse weather conditions, the device being in need of repairs and repeatedly backfiring the day the accident happened.

This court has already decided that latent or dor-

mant bodily weakness in itself, on the part of a claimant, is insufficient to be regarded as the proximate cause of a death or injury where the accident sets in motion consequences which otherwise would not have ensued if such latent or dormant condition had not existed. Associated Seed Growers, Inc. v. Scrogham, 52 Wyo. 232, 73 P. 2d 300; Equitable Life Assurance Society of the United States v. Gratiot, 45 Wyo. 1, 14 P. 2d 438. Accordingly the thinness of Nelson's heart wall and his possessing a potential or latent and dormant tendency or condition which under stress would produce an active hernia must be thus regarded. In this connection it may not be amiss to recall that under the Workmen's Compensation law of this State we have a legislative declaration in the form of a statute (Section 124-122, Revised Statutes of Wyoming, 1931, as amended by Chapter 4, Session Laws of 1935) which provides:

"A workman in order to be entitled to compensation for hernia must clearly prove:
"1. That the hernia is of recent origin;
"2. That its appearance was accompanied by pain;
"3. That it was immediately preceded by some accidental strain suffered in the course of the employment;
"4. That it did not exist prior to the date of the alleged injury. * * * *"

If we apply the test indicated by these statutory requirements to the proven facts in the case at bar and the fair inferences deducible therefrom, it would seem that the requirements of the statute had been met.

It has been noted, however, that Dr. McClellan stated in his testimony that the thinness of Nelson's heart muscle presented a condition "something like an aneurysm." In the Gratiot case, supra, the injury resulted in the bursting of an aneurysm, and this court considered the law applicable under such circumstances very

fully in connection with the claim under a life insurance policy where the defendant contended that:

"The evidence fails to show that the deceased suffered any accident, and if it could be assumed that he did, the evidence fails to show that such accident was the sole and exclusive cause of the injury of which the deceased died, but that, on the contrary, it is conclusively shown that an aneurysm was at least one of the causes of death."

In this connection we may consider the point raised by the defendant that Instruction No. 3 given by the Court and reading:

"You are instructed that if, under the peculiar temperament and condition of health of an individual who sustains an injury, such injury appears to be the active efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then such injury should be regarded as the proximate cause of death. The fact that the injured person may have had a physical infirmity and that such infirmity may be a necessary condition to that result does not deprive the injury of its distinction as the producing cause. In such case the infirmity does not arise to the dignity of a concurring cause, but, in having deprived nature of her normal power of resistance to attack, appears rather as the passive ally of the agencies set in motion by the injury. You are therefore instructed that if you believe from the evidence that George Nelson, on or about December 14, 1938, sustained an hernia due to external, violent and accidental means and that that hernia with the operation intended for the repair thereof set in motion agencies that resulted in death without the intervention of any other independent force, then the injury should be regarded by you as the proximate cause of death even though you may believe that his bodily resistance may have been weakened by other ailments, provided you further believe that such other ailments, if any there were, did not substantially contribute to cause his death.",

was erroneous. We do not think so, but consider it

quite in accord with what was ruled in the Gratiot and Scrogham cases, supra. See also Driskell v. U. S. Health & Accident Insurance Co., 117 Mo. App. 362, 93 S. W. 880.

An additional contention is made that Instruction No. 7, whose language was,

"You are instructed that if you believe from the evidence that on or about December 14, 1938, decedent, George Nelson, received an hernia by external, violent and accidental means, that an operation was performed upon him by Dr. McLellan on or about the 27th day of December, 1938, and that the operation was a proper treatment for decedent's said ailment, then the consequences following the operation may be regarded by you the same as though they had followed the injury without any intervening operation.",

was also wrong. We cannot agree. It accords with the law and facts of this case as we interpret them. In Ballam v. Metropolitan Life Insurance Co., 295 Mass. 411, 3 N. E. 2d 1012, the court said:

"Furthermore, a surgical operation which is proper treatment for a bodily injury sustained 'solely through violent external and accidental means' does not break the causal connection between such means and the death of the injured. Collins v. Casualty Co. of America, 224 Mass. 327, 330, 112 N. E. 634, L. R. A. 1916E, 1203."

Finding no prejudicial error in the record the judgment of the trial court is affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.