DANIEL KIEVIT, PLAINTIFF-APPELLANT, v. LOYAL PRO-
TECTIVE LIFE INSURANCE COMPANY, ETC., DEFEND-
ANT-RESPONDENT.

Argued January 24, 1961—Decided April 10, 1961.

476

Mr. *Ervan F. Kushner* argued the cause for the appellant (*Messrs. Kushner & Kleiner,* attorneys; Mr. *Robert Kleiner,* of counsel).

Mr. *Nicholas Conover English* argued the cause for the respondent (*Messrs. McCarter & English,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division affirmed the judgment which the Law Division had entered in the defendant's favor. See *Kievit v. Loyal Protective Ins. Co.,* 64 *N. J. Super.* 537 (*App. Div.* 1960). We granted certification on the plaintiff's application. 33 *N. J.* 331 (1960).

In 1952 the plaintiff applied to the defendant for an accident insurance policy. He was then just short of 48 years of age and his answers on the application indicated that he was in good health and that he was a carpenter. As of March 21, 1952 the defendant issued its "Form 92—Time Accident Policy" which states on its outside and on the top of its first page that it is "Non-Cancellable and Guaranteed Renewable to Age Sixty-five" and that it "Provides Indemnity for Loss of Time by Accidental Bodily Injuries, and for Loss of Life, Limb or Sight by Accidental Means to the Extent Herein Provided." On page 1 of its policy the defendant states that it will pay to the plaintiff a monthly indemnity "against loss resulting directly and independently of all other causes from accidental bodily injuries" sustained after the date of the policy and while it is in force. On page 2 of its policy there is a provision captioned "Reductions and Exceptions" which sets forth, in part, that the insurance under the policy shall not cover "disability or other loss resulting from or contributed to by any disease or ailment." Where the accidental bodily injuries result in

total disability the indemnity stipulated in the policy is $200 monthly for a period not exceeding 60 months.

The policy is now in force and was in force on August 19, 1957, when the plaintiff was accidentally struck over the left eye by a "two by four" board. Thereafter he developed tremors and became totally disabled. The defendant made disability payments under the policy until December 23, 1957 and then discontinued further payments on the ground that the plaintiff's disability did not result directly and "independently of all other causes" from accidental bodily injuries but was contributed to by a "disease or ailment." In November 1958 the plaintiff filed his complaint in the Law Division seeking the accrued disability payments and the defendant filed its answer denying liability. After a pretrial order was entered the matter came on for trial before a Superior Court judge sitting without a jury. The plaintiff and Dr. Winkler testified as witnesses for the plaintiff and Dr. Policastro testified as witness for the defendant. Their testimony was to the following effect:

The plaintiff was in good health and worked steadily for many years prior to the accident on August 19, 1957. On that day he was struck by the "two by four," went down on his knees and "got up a little groggy." He was cut over his left eye and "had a pain in the neck and in the spine and the right shoulder" but continued working through the day. On the following morning he could hardly move his right arm but returned to work and worked the "whole week till Friday." Each day he "kept getting worse" and "started to shake" and on Friday he went to see Dr. Manrodt in Pompton Plains. Dr. Manrodt "worked on" his shoulder and prescribed pills and when Dr. Manrodt later became ill he referred the plaintiff to Dr. Brown. The plaintiff testified that at that time his "whole right side, the leg and right arm shook" and that Dr. Brown's treatment was "about the same as Dr. Manrodt." Thereafter the plaintiff was examined and treated by other doctors, was in St. Joseph's Hospital, Paterson, from November 26,

1957 to December 10, 1957 and was examined at the hospital by Dr. Winkler, a qualified physician who specializes in neurology, neuropsychiatry and neurosurgery. Dr. Winkler examined the plaintiff on several occasions during his stay at the hospital and thereafter at the doctor's office on December 20, 1957, March 5, 1958 and September 26, 1959.

Dr. Winkler testified that when he first examined the plaintiff at the hospital on November 28, 1957 he found a "rapid tremor of the right extremities, more marked in the upper" and that "the tremor was present at rest and on volition." He could find no organic disease and was under the impression that he was "dealing with a conversion hysteria secondary to the accident." The plaintiff had the tremor when he was discharged from the hospital on December 10, 1957 and when Dr. Winkler examined him at his office on December 20, 1957. At that time the doctor noted that the plaintiff "had marked difficulty in maintaining his balance while standing or walking and complained of dizziness." When the doctor examined the plaintiff on March 5, 1958 he found there was "essentially no change in the picture from the previous examination." When he made his last examination on September 26, 1959 the plaintiff "appeared somewhat better" and said that his tremor "came and went." The doctor testified that he "found no evidence of disease other than the conversion hysteria" and no evidence of "previous psychiatric illness." He stated unequivocally that he found nothing to indicate that the plaintiff was suffering from "any disease" at the time of the accident and that in his opinion the accident "was in fact the precipitating cause of the psychiatric illness which followed" and which he diagnosed "as a conversion hysteria." He described conversion hysteria as a "psychiatric term which indicates that the anxiety which a patient normally has is not allowed to come to the surface but instead manifests itself in some physical manner, usually an involuntary or abnormal movement or occasionally in a paralysis or the weakness of an extremity, sometimes pain in a portion of

the body." See *Mettler, The Medical Sourcebook,* 750–757 (1959). He noted that any psychiatric illness depends upon the previous personality of the individual, and that the plaintiff probably had some "inadequate personality" which "played a part in determining the type of psychiatric illness that developed" following the accident.

Dr. Policastro, a qualified physician who specializes in neuropsychiatry, testified as a witness for the defendant. He had examined the plaintiff on only one occasion, namely, May 14, 1958; that examination was at the plaintiff's request and was made for the purpose of enabling the doctor to testify in a workmen's compensation proceeding. Dr. Policastro concluded that the plaintiff was totally disabled but was of the opinion that he probably had "a pre-existing Parkinson's disease before the accident." The pre-accident history, as given to Dr. Policastro by the plaintiff, contained no suggestion of any symptoms of Parkinson's disease but in that regard the doctor noted that the disease, which he stated to be generally caused by arteriosclerosis, infection or toxicity, is an insidious one which may be hardly perceptible and may, after trauma, run from a "chronic form to a subacute to an acute form." In response to an inquiry by the defendant's counsel as to how long the plaintiff had the disease, the doctor stated that he "felt that it pre-existed the accident"; and in response to an inquiry as to whether there was any connection between the disease and the accident in producing the plaintiff's disability the doctor stated that he felt that the disease had been running in a chronic form, and that "the accident aggravated it and it became much more pronounced and then began to run a subacute form." He noted that a conversion hysteria was "nothing more or less but the expression of an inner subconscious conflict expressed through the body that the examiner can see objectively" and acknowledged that a manifestation of conversion hysteria may be "the shaking of the right arm similar to Parkinson's disease." In response to the suggestion that many other symptoms of conversion hysteria may

parallel those of Parkinson's disease he stated that "a conversion hysterical patient may present a condition that may resemble any disease with the exception of a blood disease."

The trial judge did not in any wise question the credibility of the plaintiff; on the contrary he stated that he was "impressed by his testimony" and that the plaintiff "seemed to be a very frank man." He rather summarily dismissed Dr. Winkler's conclusion that the plaintiff was suffering from a conversion hysteria precipitated by the accident, calling it "a psychiatric conjecture"; and he expressed the view that the plaintiff had "a pre-existing condition" which "contributed to his disability" and which precluded recovery on the accident policy issued by the defendant. He concluded that the plaintiff had not satisfactorily carried the burden of proof and, as a result of inquiry by the plaintiff's counsel, made the added finding "that the plaintiff was suffering from Parkinson's disease at the time of the occurrence and that it was a chronic form." He entered judgment for the defendant and his action was affirmed by the Appellate Division which found that "there was sufficient evidence to justify a conclusion that there was a pre-existing condition and that the disability was not independent thereof, as the contract of insurance required." See 64 *N. J. Super.*, at *p.* 546. At no point did the Appellate Division express the independent view that the plaintiff had Parkinson's disease prior to the accident; it simply determined that on the record it could not say "that the finding that plaintiff's present disability was caused by the joint operation of a latent pre-existing condition and the blow on the head was error as a matter of law or that the issue has been removed from the realm of reasonable dispute" as to require disturbance of the trial judge's findings. See 64 *N. J. Super.*, at *p.* 544.

We are satisfied from the evidence that prior to the accident the plaintiff fairly considered himself to be in good health—he had none of the tremors and the related manifestations which, since the accident, have disabled him and

prevented his return to work. As he put it, the shaking started "after I got hurt," and, "I am still shaking at times." If Dr. Winkler's testimony is accepted, the plaintiff had an inadequate personality but no pre-existing disease and his accident was the precipitating cause of his present disabling illness which may be described as a conversion hysteria; if Dr. Policastro's testimony, as we view it, is accepted, the plaintiff had a pre-existing latent or dormant Parkinson's disease which was, prior to the accident, not evidenced or accompanied by any external symptoms but which, as the result of its aggravation by the accident, became activated and disabling. The issue presented is whether the plaintiff's disability resulted from accidental bodily injuries "directly and independently of all other causes" and was not "contributed to by any disease or ailment" within the fair purpose and intendment of the defendant's policy. This issue has been extensively litigated elsewhere and has resulted in many divergent expressions and holdings. See *Mahon v. American Cas. Co. of Reading,* 65 *N. J. Super.* 148, 157 *et seq. (App. Div.* 1961); 2 *Richards, Insurance* § 218 *(5th ed.* 1952); 1 *Appleman, Insurance Law and Practice, Chapters* 21 and 22 (1941); 6 *Couch, Cyclopedia of Insurance Law* § 1471 (1930); Annotation, 131 *A. L. R.* 240 (1941); Comment, 21 *U. Chi. L. Rev.* 266 (1954).

When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded "to the full extent that any fair interpretation will allow." Francis, J., in *Danek v. Hommer,* 28 *N. J. Super.* 68, 76 *(App. Div.* 1953), affirmed 15 *N. J.* 573 (1954). See *Schneider v. New Amsterdam Cas. Co.,* 22 *N. J. Super.* 238, 242 *(App. Div.* 1952); *Mahon v. American Cas. Co. of Reading, supra,* 65 *N. J. Super.,* at *p.* 165; *cf. Dittmar v. Continental Cas. Co.,* 29 *N. J.* 532, 542 (1959); *Yan-*

*nuzzi v. U. S. Casualty Co.,* 19 *N. J.* 201, 207 (1955). See also *Matits v. Nationwide Mutual Ins. Co.,* 33 *N. J.* 488, 495 (1960); *Indemnity Ins. Co., etc. v. Metropolitan Cas. Ins. Co. of New York,* 33 *N. J.* 507, 512 (1960). Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective. See *Richards, supra, p.* 742, where the author notes that the common clause to the effect that the death or disability must result from accident "independently of all other causes" would, if taken literally, be so unreasonable and repugnant to the main purpose of the policy "that the courts construe it very strictly against the insurers, and sometimes really seem to disregard it altogether." See also *Silverstein v. Metropolitan Life Ins. Co.,* 254 *N. Y.* 81, 171 *N. E.* 914 (*Ct. App.* 1930); *Scanlan v. Metropolitan Life Ins. Co.,* 93 *F. 2d* 942 (7 *Cir.* 1937).

We are not here concerned with and therefore need not pass upon a situation such as that presented in *Runyon v. Monarch Accident Ins. Co.,* 108 *N. J. L.* 489 (*E. & A.* 1932) and *Runyon v. Commonwealth Casualty Co.,* 109 *N. J. L.* 238 (*E. & A.* 1932), where a patent, active disease was found to have contributed with the accident to the resulting death of the insured. We are here concerned with a latent, inactive condition or disease which was not accompanied by any symptoms and which was precipitated or activated by the accident into a resulting disability; in comparable situations many courts have sustained recovery on one justly realistic approach or other, notwithstanding policy provisions to the effect that the indemnity shall be against loss resulting from accident, independently of all other causes and not from any disease or ailment. In *Silverstein v. Metropolitan Life Ins. Co., supra* [254 *N. Y.* 81, 171 *N. E.* 915], the insured had a small duodenal ulcer of which he was unaware and which was perforated when he fell and was struck in the abdomen; he obtained a judgment on the accident policy issued by the defendant and

it was sustained by the New York Court of Appeals. In his opinion for the court, Chief Judge Cardozo expressed the view that to exclude coverage, the disease or infirmity "must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men"; and he referred approvingly to the statement by Chief Justice Rugg in *Leland v. Order of · United Commercial Travelers of America,* 233 *Mass.* 558, 564, 124 *N. E.* 517, 520 (*Sup. Jud. Ct.* 1919) that where "there is no active disease" but merely a frail general condition, or merely a tendency to disease "which is started up and made operative," recovery may be had. See also *McGrail v. Equitable Life Assur. Soc.,* 292 *N. Y.* 419, 55 *N. E.* 2d 483 (*Ct. App.* 1944); *Thibodeaux v. Pacific Mutual Insurance Co.,* 237 *La.* 722, 112 *So.* 2d 423 (*Sup. Ct.* 1959).

In *Wolfangel v. Prudential Ins. Co. of America,* 209 *Minn.* 439, 296 *N. W.* 576 (1941), the insured was 38 years of age and manifested no bodily infirmities. He fell, injured his left hip region, became paralyzed in his left leg and later died. The evidence indicated that he had syphilis which, though theretofore latent, was activated by the accident and contributed to his death. The insurance company contended that recovery should be denied in view of its policy provisions that benefits thereunder shall be payable when death occurs through accidental means, independently of all other causes and not as the result of disease. In sustaining a judgment in favor of the beneficiary of the insured, the court expressed the view that the matter was primarily one of causation and that if the accident was the proximate cause of death then recovery should be allowed; in the course of his opinion for the court Justice Hilton had this to say:

"Wherever a person is in any respect below normal in health or bodily resistance, a strict application of the doctrine that the accident must be the sole and independent cause of the death would probably always require a decision for the insurer since it is seldom, from the medical point of view, that one cause is solely responsible

for death. *Silverstein v. Metropolitan Life Ins. Co.*, 254 *N. Y.* 81, 171 *N. E.* 914; 72 *A. L. R.* 867. This consideration has persuaded several courts to distinguish between legal and medical causes and recovery is allowed wherever the accident and its effects, acting upon an imperfect state of health, can be said to have been the proximate cause of death. *Equitable L. Assurance Society v. Gratiot*, 45 *Wyo.* 1, 14 *P. 2d* 438, 82 *A. L. R.* 1397; *Driskell v. United States Health & Acc. Ins. Co.*, 117 *Mo. App.* 362, 93 *S. W.* 880; *Wheeler v. Fidelity & Cas. Co.*, 298 *Mo.* 619, 251 *S. W.* 924; *Continental Casualty Co. v. Lloyd*, 165 *Ind.* 52, 73 *N. E.* 824; cf. *Fidelity & Cas. Co. v. Meyer*, 106 *Ark.* 91, 152 *S. W.* 995, 44 *L. R. A., N. S.* 493; *Benefit Ass'n of Ry. Employees v. Armbruster*, 217 *Ala.* 282, 116 *So.* 164; *Id.*, 224 *Ala.* 302, 140 *So.* 356." 296 *N. W.*, at *pp.* 577-578

In *Scanlan v. Metropolitan Life Ins. Co., supra,* 93 *F. 2d* 942, the deceased had enlarged varicose veins which the court assumed to be bodily infirmities; he suffered an accident which caused a thrombus to form in a varicose vein and resulted in his death. The court in sustaining a judgment for the assured's beneficiary rejected the insurance company's contention that it was absolved from liability by the policy provision that its coverage shall not extend to death caused "wholly or partly, directly or indirectly, by disease or bodily or mental infirmity"; in the course of his opinion Judge Evans had this to say:

"One may recover on an accident policy such as here in issue although the insured suffers from bodily infirmities. If the accident brought about conditions from which death resulted, the fact that the insured was ill, aged or infirm, or had bodily or mental infirmities, would not bar recovery provided the accident excited the bodily infirmity into activity and death resulted. If the infirmity alone would not have caused death, it cannot be said to have caused death when the immediate result was occasioned by an infirmity which became active only because of the accident. The infirmity may have made the insured less able to resist, but if the accident caused the condition which in turn affected the weak spot which did not resist as well as a healthy body, the cause is nevertheless the accident, and recovery cannot be avoided or evaded." 93 *F. 2d,* at *p.* 946

In *Cramer v. John Hancock, etc., Ins. Co.,* 18 *N. J. Misc.* 367, 377 *(Atlantic County Cir. Ct.* 1940), Judge Jayne cited *Scanlan* with approval and took the position that the clause

which refers to death by accidental means "independently of all other causes" refers simply to the efficient or proximate cause. In *Prudential Ins. Co. of America v. Carlson,* 126 *F.* 2d 607 (10 *Cir.* 1942), the court had occasion to apply New Jersey law in an action by the beneficiary of an insured who had a policy which provided for payment of loss resulting from injuries effected through accidental means, independently of all other causes and not wholly or partly from disease or infirmity. The insured while in apparent good health was in an automobile accident. He received serious bodily injuries, suffered a coronary occlusion and died within 30 days after the accident. An autopsy revealed that he had arteriosclerosis which had existed for many years and the medical testimony of both parties established that had it not been for the arteriosclerosis the blow which the deceased suffered would not have caused the thrombus which resulted in his death. The insurance company contended that its coverage did not apply since upon the undisputed testimony the decedent's death was not caused by bodily injury resulting solely from accidental means but was partly caused by disease. This contention was rejected by the court which sustained the plaintiff's recovery; in the course of its opinion it relied upon and quoted extensively from *Cramer* and Judge Jayne's approval of the following expressions in *Kelly v. Prudential Ins. Co. of America,* 334 *Pa.* 143, 6 *A.* 2d 55, 58–59 (*Sup. Ct.* 1939):

"The law is that if a disease, while existing, be but a condition and the accident the moving, sole and proximate cause of the death, the exception in the policy will not relieve the insurer for death so caused. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause.

'* * * It is clear that if the physical condition of the insured is merely weakened or his resistance to disease lowered by a pre-existing ailment or disease incident to advancing age, which creates a bodily condition of a passive nature not alone sufficient to cause death, this fact will not prevent recovery for death resulting from accidental means under an insurance policy providing indemnity therefor, even though death resulting indirectly from bodily or mental

infirmity or disease is excluded as a risk, provided the accident sets in progress the chain of events leading directly to death.'" 126 *F.* 2d, at *pp.* 610–611

In *Mahon v. American Cas. Co. of Reading, supra,* 65 *N. J. Super.* 148, the Appellate Division dealt extensively with the subject at hand and discussed the pertinent decisions throughout the country. The defendant Casualty Company had insured the plaintiff against loss resulting directly and independently of all other causes from injury caused by accident. The plaintiff who was then nine years of age accidentally bumped his head against that of a schoolmate and immediately thereafter developed symptoms indicating neurological pathology. He was subjected to brain surgery which revealed abnormal positioning of the brain stem and evoked a medical diagnosis of Arnold-Chiari malformation. See 65 *N. J. Super.,* at *p.* 154. The Casualty Company contended that its coverage was inapplicable on the ground that the loss was not one which was caused independently of all other causes from accidental injury but resulted at least in part from the pre-existing abnormal condition of the brain. This contention was rejected by the Appellate Division which held that the matter was one of causation for determination by the trier of the facts. It noted that from the testimony it could be found that as a direct result of the accident "a dormant, quiescent abnormality" had been transformed into "a debilitating, incapacitating bodily condition" and it referred to the many decisions which had invoked the causation approach to sustain a finding that the loss was caused by the accident and that the pre-existing abnormality was "only a condition, not a 'cause'." See 65 *N. J. Super.,* at *p.* 177. It stressed and concluded that the plaintiff would be entitled to recover the hospital and medical expenses sought on his behalf, upon a determination that the accidental injury rather than the pre-existing abnormal condition of the brain was the proximate cause "in the sense of the direct, efficient and predominant cause." See 65 *N. J. Super.,* at *pp.* 173, 178.

While the policy in *Mahon* expressly limited its coverage to loss caused by accident, independently of all other causes, it did not contain an express exclusionary clause denying liability for loss resulting from disease or ailment. The Appellate Division differentiated policies which contain such exclusionary clause from those which omit it although it acknowledged that most of the reported cases had not drawn any such clear line (see 65 *N. J. Super.*, at *p.* 158) ; indeed it may be noted that in the pertinent cases quoted from earlier in this opinion the courts apparently attached no significance to the fact that the policies before them contained both the limited coverage and the exclusionary clause. See *Wolfangel v. Prudential Ins. Co. of America, supra; Scanlan v. Metropolitan Life Ins. Co., supra; Cramer v. John Hancock, etc., Ins. Co., supra; Prudential Ins. Co. of America v. Carlson, supra; Kelly v. Prudential Ins. Co. of America, supra.* See also 65 *N. J. Super.*, at *p.* 161. In *Krug v. Mutual Life Ins. Co. of New York*, 235 *Mo. App.* 1224, 149 *S. W. 2d* 393, 403 (*Ct. App.* 1941), the court stated that the exclusionary provision may be described as a "redundant clause" since if it is found that the insured died as the result of bodily injury effected solely through accident and independently of all other causes, then it must be found that he did not die as a result of disease or ailment. See also *Gennari v. Prudential Insurance Company of America*, 324 *S. W. 2d* 355 (*Mo. Ct. App.* 1959) ; *Id.*, 335 *S. W. 2d* 55 (*Mo. Sup. Ct.* 1960).

██ In the instant matter we attach little significance to the presence of the exclusionary clause in view of the primary provision limiting coverage to loss from accidental bodily injuries, directly and independently of all other causes. As the Appellate Division itself recognized in *Mahon,* the court's goal in construing an accident insurance policy is to effectuate the reasonable expectations of the average member of the public who buys it; he may hardly be expected to draw any subtle or legalistic distinctions based on the presence or absence of the exclusionary clause for he pays

premiums in the strong belief that if he sustains accidental injury which results (in the commonly accepted sense) in his disability he will be indemnified and not left empty-handed on the company's assertion that his disability was caused or contributed to by a latent disease or condition of which he was unaware and which did not affect him before the accident. See 65 *N. J. Super.*, at *p.* 165.

When the Company issued its accident policy to Mr. Kievit it knew that, although he was then about 48 and in good health, he could and presumably would keep the policy in force until he was 65 and that in the course of time he would undoubtedly be subjected to bodily conditions and diseases incident to the aging process. If the terms of the policy were read literally, the policy would be of little value to him since disability or death resulting from accidental injury would in all probability be in some sense contributed to by the infirmities of age. See *Inter-Ocean Casualty Company v. Scott,* 91 *Ga. App.* 311, 85 *S. E. 2d* 452, 456 (*Ct. App.* 1954). Such literal reading was never contemplated and it may fairly and justly be concluded that it also was never contemplated that indemnity would be unavailable where a condition or disease which was wholly dormant was activated and became disabling as the result of accidental injury. In *United States Fidelity & Guaranty Company v. Hood,* 124 *Miss.* 548, 87 *So.* 115, 15 *A. L. R.* 605 (*Sup. Ct.* 1921), the court made the following remarks which are pertinent here:

"It is not sufficient to defeat the policy that the accident may have made some latent disease active, which disease contributed in some degree to the death. If the disease was active and of such character and virulence as to endanger life apart from the accident, but might not have done so had the accident not happened, then that may be said to be a proximate contributing cause. The court ought not to construe a contract so as to defeat rather than promote the purpose of the party in taking out the insurance. The condition of health or the existence of latent and inactive disease evidently was not contemplated by the parties in making the contract. No medical examination was required, and the pleadings did not seek to question the answers given by the assured as to his condition of

health at the time the application was signed." 87 *So.*, at *p.* 120, 15 *A. L. R.*, at *p.* 614

See *New York Life Insurance Company v. McGehee*, 260 *F. 2d* 768, 772 (*5 Cir.* 1958); *La Barge v. United Insurance Company*, 209 *Or.* 282, 306 *P. 2d* 380 (*Sup. Ct.* 1957); *Life and Casualty Ins. Co. of Tenn. v. Jones*, 230 *Ark.* 979, 328 *S. W. 2d* 118 (*Sup. Ct.* 1959); *Kilgore v. Reserve Life Insurance Company*, 231 *S. C.* 111, 97 *S. E. 2d* 392 (*Sup. Ct.* 1957); *Miller v. United Ins. Co.*, 113 *Cal. App. 2d* 493, 248 *P. 2d* 113 (*D. Ct. App.* 1952); *Bankers Life Co. v. Nelson*, 56 *Wyo.* 243, 108 *P. 2d* 584 (*Sup. Ct.* 1940); *Rebenstorf v. Metropolitan Life Ins. Co.*, 299 *Ill. App.* 71, 19 *N. E. 2d* 420 (*App. Ct.* 1939); *Equitable Life Assur. Soc. of United States v. Gratiot*, 45 *Wyo.* 1, 14 *P. 2d* 438, 82 *A. L. R.* 1397 (*Sup. Ct.* 1932).

██ Under *R. R.* 1:5–4 we may make new findings of fact, giving due regard to the opportunities of the trial court to judge the credibility of the witnesses. The trial court did not in any wise question the credibility of the plaintiff whose testimony establishes that prior to the accident he was, as far as he knew, in good health and that following the accident he, for the first time, developed the tremors and other manifestations which have disabled him. Dr. Winkler's testimony, which was based on various examinations made by him in his capacity as a treating physician and indicated that the accident was the precipitating cause of the plaintiff's disabling condition which he diagnosed as a conversion hysteria, was dismissed by the trial court as a "psychiatric conjecture"; but the record does not at all indicate why the trial court viewed it as more conjectural in nature than Dr. Policastro's testimony which was based on a single examination made for the purpose of enabling him to testify as an expert medical witness. *Cf. Bober v. Independent Plating Corp.*, 28 *N. J.* 160, 167 (1958). However, we need not pursue the matter since, we find that, accepting the testimony of either Dr. Winkler or Dr. Policastro, the accident was nonetheless the proximate cause of

the plaintiff's disability and that the pre-existing dormant condition or disease, activated by the accident into an incapacitating condition or disease, was not, under the principles and precedents approved earlier in this opinion, a disqualifying contributing cause at any time during the period for which recovery was sought by the plaintiff. See *Kilgore v. Reserve Life Insurance Company, supra*, 97 *S. E. 2d*, at *p.* 394.

Although the record indicates that New Jersey was more significantly connected with the insurance policy than was Massachusetts, the Appellate Division took the position that the policy was a Massachusetts contract and its construction was therefore to be governed by Massachusetts law. See 64 *N. J. Super.*, at *pp.* 542–543; *cf. Buzzone v. Hartford Accident & Indemnity Co.*, 41 *N. J. Super.* 511, 514 (*App. Div.* 1956), affirmed 23 *N. J.* 447, 452 (1957); *Gray v. Joseph J. Brunetti Construction Co.*, 266 *F. 2d* 809, 814 (3 *Cir.* 1959). The insured is domiciled in New Jersey where he has resided since prior to the issuance of the defendant's policy. He signed his application for the insurance at Pequannock, New Jersey, where he lived; the application was witnessed there by William J. Kennedy, Jr., as the Company's agent having his office in West Englewood, New Jersey. The application form set forth that the application "shall not be binding upon the Company until approved by the President or Secretary at the home office, nor until the initial premium has been paid"; the record is silent as to where the initial premium was paid and where the policy was delivered and it may well be that both the payment and the delivery occurred in New Jersey. The policy itself did not state where it was countersigned nor did it state that it was to become effective only upon its execution by the Company in Massachusetts. It did state that notice of injury was to be given to the Company at Boston, Massachusetts "or to any authorized agent of the Company" and this presumably permitted the giving of notice to the Company's agent in New Jersey. The policy set forth

in paragraph 15 that if any time limitation provided therein was less than that permitted by the law of the state where the insured resided at the time of the issuance of the policy, then the limitation was to be extended to conform with the minimum period provided by such law. The policy was dated March 21, 1952 and provided that it shall take effect at 12:01 Standard Time "of the place where the Insured resides."

 Under the circumstances it may not realistically or fairly be said that the local insured and the Company both contracted with the Massachusetts law in mind and it would be not only unjust to the local insured but also contrary to the true interests of our State to deny to him the benefits of the favorable local law. In recent years there has been increased awareness of the unwisdom of rigid application of the traditional conflict of laws doctrines in the field of contracts and steps have been taken towards giving greater recognition to the local law of the state with which the contract had its most significant relationship. See *American Law Institute, Restatement of the Law 2d, Conflict of Laws, Tentative Draft No.* 6 (1960); cf. *Auten v. Auten,* 308 *N. Y.* 155, 124 *N. E.* 2d 99, 102, 50 *A. L. R.* 2d 246 (*Ct. App.* 1954); *Boston Law Book Company v. Harthorn,* 119 *Vt.* 416, 127 *A.* 2d 120 (*Sup. Ct.* 1956); *Jansson v. Swedish American Line,* 185 *F.* 2d 212, 30 *A. L. R.* 2d 1385 (1 *Cir.* 1950); *Fricke v. Isbrandtsen Company,* 151 *F. Supp.* 465 (*D. C. N. Y.* 1957).

In the American Law Institute's recent *Tentative Draft* on the subject, *supra,* it is proposed that the rights created by a life insurance contract (§ 346(h), *p.* 108) or by a noncancellable disability contract (§ 346(h), *p.* 116) be generally determined by the local law of the state where the insured was domiciled at the time the policy was issued. See also *Tentative Draft, supra,* § 334(a), *p.* 65, Illustration 3. Where, as here, that law furthers the wholesome policy of affording to the insured a broad measure of protection in fair fulfillment of his reasonable expectations,

its application would appear to find solid support in the really pertinent policy considerations. See 74 *Harv. L. Rev.* 357, 378 (1960); *Ehrenzweig, Adhesion Contracts in the Conflict of Laws,* 53 *Colum. L. Rev.* 1072, 1083 (1953); *Cavers, A Critique of the Choice-of-Law Problem,* 47 *Harv. L. Rev.* 173, 192 (1933); cf. *Daily v. Somberg,* 28 *N. J.* 372, 379 (1958). However, we need not now pursue the inquiry further since nothing persuasive has been presented to us to indicate that the Massachusetts court would deal with the plaintiff's claim in any different manner than we have. See *Howe v. National Life Ins. Co.,* 321 *Mass.* 283, 72 *N. E. 2d* 425, 170 *A. L. R.* 1254 (*Sup. Jud. Ct.* 1947); *Brown v. United States Fidelity and Guaranty Co.,* 336 *Mass.* 609, 147 *N. E. 2d* 160 (*Sup. Jud. Ct.* 1958); cf. *N. J. S.* 2A:82–27. In *Howe, supra,* the Supreme Judicial Court of Massachusetts, while denying recovery where an active disease was found to have participated with the accident in causing the resulting death, stated flatly that "a death caused by bodily injuries accidentally sustained would be within the terms of the policy if the accident, by reason of the frailty or general weakness of the insured, a predisposition to a disease, or the presence of a disease then inactive or dormant, resulted in a fatal termination, even if this result would not have followed if the injured person was in normal health." 72 *N. E. 2d,* at *p.* 428. In *Brown, supra,* the court, while again denying liability where an active disease participated with the accident, recently reaffirmed the quoted language from *Howe.* See 147 *N. E. 2d,* at *p.* 165; cf. *Ballam v. Metropolitan Life Ins. Co.,* 295 *Mass.* 411, 3 *N. E. 2d* 1012, 108 *A. L. R.* 1 (*Sup. Jud. Ct.* 1936); *Collins v. Casualty Co. of America,* 224 *Mass.* 327, 112 *N. E.* 634, *L. R. A.* 1916E, 1203 (*Sup. Jud. Ct.* 1916); *Freeman v. Mercantile Mut. Acc. Ass'n,* 156 *Mass.* 351, 30 *N. E.* 1013, 17 *L. R. A.* 753 (*Sup. Jud. Ct.* 1892).

The judgment of the Appellate Division is reversed and the cause is remanded to the Law Division for entry of judgment for the plaintiff.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.