H. David HENRY, Plaintiff,

v.

The HOME INSURANCE COMPANY,
etc., et al., Defendants.

No. CV 94–4155 AWT.

United States District Court,
C.D. California.

Dec. 6, 1995.

Francis A. Sparagna, Sparagna, Sparagna & Ferrone, Encino, California, for Plaintiff H. David Henry.

Hugh H. Helm, Susan G. Wells, Galton & Helm, Los Angeles, California, for Defendant The Home Insurance Company.

## MEMORANDUM OPINION

TASHIMA, District Judge.

This is an action to recover benefits under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Defendant The Home Insurance Company ("Home"), has moved for summary judgment. For the reasons stated below, Home's motion will be denied and the action remanded for reevaluation of Henry's claim in a manner consistent with this opinion.

## BACKGROUND

During the time frame of the underlying events, Henry was an associate attorney with the law firm of LeBoeuf Lamb Leiby & MacRae ("LeBoeuf"), in Los Angeles. Henry was insured under an Accidental Death & Dismemberment Plan (the "Plan") maintained by his employer, and insured by Home. The Plan is an ERISA plan.

In March or April, 1993, Henry, then aged 31, alleges that he fell down a stairway in LeBoeuf's parking garage, hitting the back of his head hard enough to see stars. Henry claims he had a large bruise and bump on the back of his head, and experienced neck and back pains for several months after the fall. He did not report the incident because, at the time, he did not believe he had suffered any major injury.

On July 30, 1993, Henry noticed a distortion of vision in his left eye. The next day, he was examined by his ophthalmologist who determined that Henry had a detached retina ("detachment"), which required immediate surgery. On August 1, 1993, Dr. Roger Novak, a retina specialist, operated to repair the detachment. Following the surgery, Henry had limited vision in his left eye.

Based on his discussions with Dr. Novak, Henry was under the impression that the detachment was caused by a bodily injury. The only accident that Henry had suffered in the recent past had been the fall down the stairs. Accordingly, Henry assumed, and still maintains, that the fall caused the detachment.

On December 23, 1993, Henry filed a claim for accident benefits under the Plan. Home requested medical records from Henry's treating physicians, and asked Dr. Novak to respond to particular questions about the detachment and its cause. In February, 1994, Home concluded that an "independent" examination was necessary to determine the validity of Henry's claim.

To that end, Henry was examined by Dr. Marc Yoshizumi on March 1, 1994. Dr. Yoshizumi allegedly indicated to Henry during the exam that he represented the interests of Home. In the course of his examination, Dr. Yoshizumi discovered that Henry's retina had re-detached.

On March 10, 1994, Dr. Novak again operated on Henry to correct the detachment. Towards the end of the surgery, Henry began to hemorrhage, resulting in a permanent loss of sight in his left eye. Henry now wears a prosthetic device.

By letter dated March 9, 1994, Home notified Henry that his claim had been denied. Home was of the opinion that a pre-existing medical condition led to the detachment, not the fall. Henry requested a review of the denial. By letters dated March 29 and 30, 1994, Home notified Henry that, after review of the record, the decision to deny the claim had been affirmed. This action followed.

### RELEVANT PLAN PROVISIONS

The Plan provides benefits for loss of sight in one eye that occurs as a result of an accidental injury. "Injury" is defined in the Plan as "an accidental bodily injury which is a *direct result, independent of all other causes,* of a hazard set forth in the 'Description of Hazards.' "[1] (Emphasis added.) If Home's moving papers are to be believed, Home interprets this phrase quite literally, and denies coverage for injuries that are related to a pre-existing medical condition. In another section of the Plan, Home excludes coverage for "illness or disease."

### MEDICAL EVIDENCE

#### I. Evidence in the Administrative Record.

##### A. Dr. Novak.

Home sent Dr. Novak several letters asking him five specific questions about the detachment. Two questions addressed the cause of the detachment:

Q #1: Did Mr. Henry sustain an accidental bodily injury that resulted in retinal detachment to his left eye?

A: I have no direct evidence that bodily injury was the result of the retinal detachment to his left eye. Usually, a fall does not lead to a retinal detachment but if there is a predisposing anatomical weakness in the retina, then a retinal detachment can occur.

Q #5: Please advise in your medical opinion if Mr. Henry's glaucoma caused or contributed to the retinal detachment.

A: By the wording in your questions, I can see that you are confused about the medical causes of a retinal detachment. A majority of these detachments occur spontaneously. Many times, they are related to near-sightedness. Sometimes, there are anatomical predispositions related to a person's genetics. Trauma can be another source but usually is a direct blow to the eye with other signs of severe ocular trauma.

##### B. Dr. Yoshizumi.

Dr. Yoshizumi provided the following opinion on the cause of the detachment:

Q #2: Did Mr. Henry's claimed slip and fall in March or April, 1993, result in or cause his retina to detach approximately four months later?

A: I do not believe that [a] fall was the cause of Mr. Henry's retinal detachment. The patient has myopia ... Moreover, my examination revealed lattice degeneration in both eyes. The combination of myopia and lattice degeneration causes thinning of the retina and leads to retinal detachment. In these cases a fall need not occur to establish causality for the retinal detachment.

#### II. Evidence Not in the Administrative Record.

By declaration, Dr. Novak has stated further:

2. My first contact with David Henry occurred on July 31, 1993 ... [M]y observation confirmed the diagnosis of detached retina ... There was a subretinal fibrosis in the equatorial region and was also noted

---

1. The parties do not contest that Henry's alleged fall is a covered "hazard" under the Plan.

on the superior edge of the detachment....

3. A subretinal fibrosis is a scar tissue formation under the retina which indicates that the retina had tried to heal itself for some time prior to Mr. Henry's manifestation of symptoms for which I saw him on July 31, 1993. The scar formation is consistent with a retinal detachment of a three to five month duration.

4. Retinal detachments can occur without noticable [sic] symptoms until the detachment reaches the area of the macula which will then interfere with a person's vision.

5. In addition to the finding of scar tissue, I observed the radial lattice degeneration....

6. By history, Mr. Henry was myopic....

7. Myopia in and of itself can cause a retinal detachment, but by far in the majority of cases seen where myopia is the sole cause, it is more severe than in Mr. Henry's case. Moreover, only a very minor percentage of persons with myopia sustain retinal detachments, and statistically speaking, rarely seen in a person in the early 30's such as David Henry.

8. Myopia and lattice degeneration are predisposing factors toward retinal detachment. In addition, trauma, such as a blow to the head, can precipitate a retinal detachment.

9. Under the circumstances of this case, the timing of Mr. Henry's fall within a four to five month period of symptoms of a retinal detachment and the findings of a subretinal fibrosis which indicated that the retinal detachment had been present but non-symptomatic for an equivalent period of time as the fall, are too coincidental to ignore. In my opinion, the fall, as described by Mr. Henry, was a substantial factor or a precipitating cause of the retinal detachment....

11. This is the first case in which I have given a medical legal opinion ... In February, 1994, had I been asked whether

it was my opinion that Mr. Henry's fall in the spring of 1993, caused the retinal detachment, I would have given the opinion contained in this declaration.

## ANALYSIS

### I. Standard of Review.

Preliminarily, the court must decide what standard of review is appropriate in this case. Before the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a plan administrator's decision to deny benefits was reviewed under an arbitrary and capricious standard of review. *Orozco v. United Air Lines, Inc.,* 887 F.2d 949, 952 (9th Cir. 1989). *Bruch* held that a court must review the decision *de novo,* unless the plan gives the administrator of the plan discretionary authority to determine eligibility for benefits. 489 U.S. at 103, 109 S.Ct. at 950.

Following *Bruch,* many cases have considered whether the language of a particular plan reserved discretion in the plan's administrators to determine eligibility under the plan. *See, e.g., Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir.1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993). In *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948 (9th Cir.1993), the Ninth Circuit found a discretionary grant of authority in the following language:

The Plan instructs an employee to file a claim with the plan administrator, who will issue a "[w]ritten decision[ ] of approval or denial," including, in the event of a denial, a "clear reference to the Plan provisions upon which the denial is based." The claimant may then request a review of the denial by the insurance company, which, after a "full and fair evaluation," will also issue a written decision that includes "specific reasons for the decision, with reference to the Plan provision on which the decision is based..

*Id.* at 949 n. 1. Home's policy tracks this language nearly identically.[2] Accordingly,

**2.** The Plan states in relevant part: Home "must be given written notice of a claim.... ¶ Written proof of loss must be provided.... ¶ In the

event that your claim is denied ... [Home] will notify you in writing.... [N]otice of denial shall include: 1) The specific reason or reasons for

**1396**

the court is bound to apply the arbitrary and capricious standard of review.

 Under the arbitrary and capricious standard, the court reviews for an abuse of discretion. *Eley v. Boeing Co.*, 945 F.2d 276, 279 (9th Cir.1991). A court should reject an administrator's decision only if it is rendered without explanation, the findings of fact are clearly erroneous, or the administrators construed the terms of the plan in a manner inconsistent with its plain language. *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472–1473 (9th Cir.1993).[3]

 Home argues that under this deferential standard of review, the decision to deny Henry's benefits must be affirmed. Home correctly points out that under the arbitrary and capricious standard of review, a court may only consider evidence that is part of the administrative record. *Id.*, at 1471. The only evidence in the administrative record are the opinions of Drs. Yoshizumi and Novak, who both declined to assign causation of the detachment to the fall. The court may not consider Dr. Novak's additional declaration as it was not part of the administrative record. Home argues that based on the evidence in the administrative record, there is substantial evidence that Henry's detachment was related to a pre-existing condition. Thus, as Henry's pre-existing medical condition contributed to the detachment, Home argues that it was not an abuse of discretion to deny Henry's claim.

The court rejects this argument because, as explained below, Home conducted the initial investigation under a misconception of the law. *See Mongeluzo v. Baxter Travenol*

*Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir.1995); *Patterson*, 11 F.3d at 951.

## II. Reasonable Expectations Doctrine.

 The reasonable expectations doctrine provides that "courts will protect the reasonable expectations of ... insureds ... even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 387 (9th Cir. 1994). The purpose of the doctrine is to protect insureds "objectively reasonable expectations of coverage." *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 555 (9th Cir. 1995). In *Saltarelli*, the Ninth Circuit expressly adopted this doctrine as part of the federal body of ERISA law. 35 F.3d at 387.

In *Saltarelli*, the plaintiff switched insurance carriers, and within the month was diagnosed with stomach cancer. *Id.* at 384. The new insurer denied coverage because of the plan's "pre-existing condition exclusion." *Id.* The Ninth Circuit refused to enforce this exclusion because it was buried within a conjunctive reading of several definitions of the plan, and thus was "not conspicuous enough to attract the attention of a reasonable layman." *Id.* at 385.

Here, like the plan in *Saltarelli*, the phrase "direct result, independent of all other causes," which severely limits coverage for accidents, is inconspicuously included within the definition of "injury." The Plan does not prominently indicate that recovery for an accident is to be construed so narrowly. As

---

denial with reference to those policy provisions on which the denial is based; ... 3) The steps to be taken if you or your beneficiary wish to have the decision reviewed.... ¶ You ... may appeal a denied claim.... ¶ [Home] will make a full and fair review of the claim.... The final decision on review shall be furnished in writing and shall include the reasons for the decision with reference, again, to those policy provisions upon which the final decision is based."

3. As Home was both the insurer and the plan administrator, Home had a financial interest in denying Henry's benefits. In some cases, such a conflict necessitates a more stringent standard of review. *See Bruch* 489 U.S. at 111, 109 S.Ct. at 954. The Ninth Circuit recently clarified the

circumstances under which this less deferential review applies. *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322–1323 (9th Cir.1995). *Atwood* held that where a plaintiff comes forward with evidence showing that the plan administrator's self-interest led to a breach of fiduciary obligations, then under general trust principals any action taken by the plan administrator is presumptively void. *Id.* at 1323. In such circumstances a court should employ a *de novo* review of the record. *Id.* Here, Henry has not come forward with substantial evidence indicating that Home breached its fiduciary obligation to him. Accordingly, the court declines to conduct a *de novo* review of the record.

this phrase is not sufficiently conspicuous to apprise insureds of its impact on the scope of coverage, it denies insureds their reasonable expectations of accident insurance. *See Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir.1995).

This conclusion is consistent with many other cases.[4] In fact, one of the cases that developed the doctrine of reasonable expectations involved the interpretation of a similar phrase. *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22 (1961).[5] *Kievit* involved an insurance plan that provided coverage for accidental injuries arising "directly and independently of all other causes." In *Kievit*, the plaintiff was hit on the head with a board, which most likely caused a dormant case of Parkinson's disease to emerge. *Id.* at 25–26. The court held that although the phrase could be literally applied, thus resulting in a denial of coverage for the plaintiff, a reasonable person would not expect so narrow a definition of accident. *Id.* at 26.

> When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations.... Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective.

*Id.* at 25–26 (citing 2 Richards, Insurance § 218 (5th ed. 1982)). Accordingly, the court held that the existence of the plaintiff's pre-existing Parkinson's did not defeat recovery under the policy. *Id.* at 31.

*Kievit* is not unique; many other courts have refused to give literal effect to phrases similar to "direct result, independent of all other causes." *See, e.g., Adkins v. Reliance Standard Life Ins. Co.*, 917 F.2d 794, 797 (4th Cir.1990); *Carroll v. CUNA Mut. Ins. Soc'y*, 894 P.2d 746, 755 (Colo.1995); *Slobojan v. Western Travelers Life Ins. Co.*, 70

Cal.2d 432, 443, 74 Cal.Rptr. 895, 450 P.2d 271 (1969).[6] As Chief Judge Cardozo opined in *Silverstein v. Metropolitan Life Ins. Co.*, 254 N.Y. 81, 171 N.E. 914, 915 (1930), literal application of the phrase would defeat the purpose of accident insurance for all but the healthiest of people:

> In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or infirmity. Something more, however, must be shown to exclude the effects of an accident from coverage of a policy.

Quoted in *Carroll*, 894 P.2d at 754 (citations omitted).

People buy accident insurance to be covered for injuries arising out of accidents; reasonable people do not contemplate that a minor or dormant pre-existing condition will defeat the protection of such insurance. If the phrase is given literal effect, only the healthiest of individuals would be given the protection of their policies. Those suffering from even the slightest pre-existing medical condition would be precluded from benefits— the purchased coverage would be illusory. The court will not construe the contract to defeat, rather than promote, the purpose of accident insurance. The court therefore concludes that literal application of the phrase "direct result, independent of all other causes" defeats the reasonable expectations of insureds.

### III. The Applicable Test.

Having concluded that the phrase defeats the reasonable expectations of insureds, the court must now define the proper inquiry to be made.

Interpretation of ERISA insurance policies is governed by a uniform body of federal common law. *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir.1990).

---

**4.** *See* note 6, *infra*.

**5.** *See, e.g.,* Kenneth S. Abraham, *Judge–Made Law and Judge–Made Insurance: Honoring the Reasonable Expectations of the Insured*, 67 Va. L.Rev. 1151, 1157–1160 (1981) (noting *Kievit* as one of the cases to develop the doctrine).

**6.** For a complete discussion of all of these cases, *see* 1B John A. Appleman & Jean Appleman, *Insurance Law and Practice*, § 393 (West 1981 & Supp.1994) (hereafter "Appleman"); Annotation, *Pre–Existing Physical Condition as Affecting Liability under Accident Policy or Accident Feature of Life Policy*, 84 A.L.R.2d 176 (1962 & Supp.1991).

The courts are directed to formulate a nationally uniform federal common law to supplement the explicit provisions and general policies set out in ERISA, referring to and guided by principles of state law when appropriate, but governed by the federal policies at issue.

*Saltarelli,* 35 F.3d at 386 (citing *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1500 (9th Cir.1984)).

■ The Fourth Circuit has adopted a federal common law interpretation of the phrase "directly and independently of all other causes." *Adkins,* 917 F.2d at 796. *Adkins* holds that a pre-existing condition, susceptibility or pre-disposition based on congenital weakness does not bar recovery "unless it *substantially* contributed to the disability or loss." *Id.* (emphasis added). Under *Adkins,* to determine whether benefits are payable requires a two-step analysis: 1) Did the plaintiff have a pre-existing condition, predisposition, or susceptibility to injury? 2) If yes, did it substantially contribute to the injury? *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1028 (4th Cir.1993).

The Colorado Supreme Court, earlier this year, fashioned a somewhat different test. *Carroll,* 894 P.2d at 755. *Carroll* interpreted the phrase "directly and independently of all other causes" to require a showing that the accident was the *predominant* cause of the injury. *Id.* Essentially, this is similar to a proximate cause inquiry. *Id.* at 754. *Carroll* explained that a proximate cause analysis effectively requires the plaintiff to show that the accident was the predominant, as opposed to remote, cause of the injury. *Id.* (citing 1A Appleman § 362, at 490–91).

California also applies a proximate cause test. *Slobojan,* 70 Cal.2d at 443, 74 Cal.Rptr. 895, 450 P.2d 271. That is, if the accident "sets in progress the chain of events leading directly to death [or injury]" then a plaintiff can recover regardless of a pre-existing medical condition. *Id.*[7]

■ Of these two tests, the court concludes that the predominant cause test better comports with the reasonable expectations of insureds. The focus of an analysis under the predominant cause test is on the effect the accident had on the insured. The Fourth Circuit's substantial factor test, by contrast, focuses on the effect the insured's health had on the accident. When purchasing accident insurance, particularly group insurance, consumers do not generally undergo physical examination to determine whether a pre-existing medical condition could potentially preclude recovery. Thus, denying coverage for injuries that may be aggravated by latent medical conditions undercuts the purpose of accident insurance. The court therefore declines to adopt the Fourth Circuit's substantial factor test.

Under the predominant cause test, if a plaintiff can show that the accident directly caused the resulting injury, then recovery is appropriate, even where a genetic predisposition, susceptibility or pre-existing condition may have contributed to the extent of the harm. Because this test comports with the reasonable expectations of insureds, the court adopts it as part of the federal common law governing ERISA.

## IV. Remand For Reconsideration.

■ Because Home applied a literal interpretation of the phrase "direct result, independent of all other causes," Home failed to ask the doctors whether the fall was a predominant cause of the accident. Home conducted its investigation and made its claim determination under a misconception of the meaning of the Plan's provisions. Therefore, under the arbitrary and capricious standard, Home's rejection of Henry's claim was an abuse of discretion. *See Allen v. Shalala,* 48 F.3d 456, 457 (9th Cir.1995) (incorrect application of law is an abuse of discretion).

It is not the court's function *ab initio* to apply the correct standard to Henry's claim.

---

**7.** Henry insists that the California proximate cause test applies directly based on language of the Plan, which states that the "terms of this policy in conflict with the laws of the state where it is delivered are amended to conform to such laws." However, the Plan at issue is governed by ERISA, and as such, federal law applies, not California law. Thus, while state law may be useful in developing ERISA common law, it does not apply of its own force. *Saltarelli,* 35 F.3d at 386.

That function, under the Plan, is reserved to the Plan administrator. Accordingly, this matter must be remanded to the Plan administrator for a re-determination of Henry's claim, in a manner consistent with this opinion.[8] *See Patterson*, 11 F.3d at 951 (ordering district court to remand case to plan administrator to make further factual findings).

**IT IS ORDERED:**

1. Home's motion for summary judgment is DENIED.

2. Judgment shall be entered remanding this matter to the Plan administrator for a re-determination of Henry's claim, consistent with this opinion.[9]

---

8. Because the present administrative record was made under a misapprehension of the applicable Plan provisions, Henry should be given the opportunity to supplement the record in the light of this disposition.

9. Henry moved neither for summary judgment in his favor nor for remand. However, all of the legal issues involved on the remand issue have been fully considered. *Cf. Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311–12 (9th Cir.1982) (court may *sua sponte* grant summary judgment to opposing party if issues have been fully ventilated).