David C. **BONILLA**, et al., Plaintiffs,

v.

**PRINCIPAL FINANCIAL GROUP,**
et al., Defendants.

No. CIV 99–1119–PHX–SMM.

United States District Court,
D. Arizona.

Aug. 18, 2003.

David C. Bonilla, Yuma, AZ, pro se.

Patricia Bonilla, Yuma, AZ, pro se.

A. James Clark, Esq., Heather D. Moore, Clark & Moore, Yuma, AZ, for Plaintiffs/Counter–Defendants.

Stephanie Lee Chilton, Bess Kunz, Phoenix, AZ, Lawrence A. Peshkin, Esq., Paulette S. Sarp, Esq., Peshkin & Kotalik PC, Phoenix, AZ, for Defendant/Counter–Claimant.

## ORDER

MCNAMEE, Chief Judge.

Defendant Principal Life Insurance Company [1]'s ("Principal") Motion for Summary Judgment [Doc. No. 76] is pending before the Court. After considering the arguments raised by the parties in their briefings and oral arguments, the Court now issues the following ruling.

1. The Docket lists Defendant as Principal Financial Group d/b/a Principal Life Insurance Company.

## BACKGROUND

Plaintiff Patricia Bonilla ("Mrs. Bonilla") was diagnosed with atrial fibrillation ("a-fib") by Henry Meyer, M.D. ("Dr. Meyer"), of Cardiac Arrhythmia Associates, in 1990. (Def.'s Statement of Facts in Supp. of Renewed Mot. for Summ. J. ("Def.'s SOF # 2") [Doc. No. 69] Ex. 1 at 9, Ex. 7.) In approximately 1991, Tony Chee, M.D. ("Dr. Chee") first advised Mrs. Bonilla that she needed a heart pacemaker. (*Id.* Ex. 1 at 11.) Subsequently, Dr. Meyer repeatedly made this same recommendation to Mrs. Bonilla. (*Id.* Ex. 1 at 14–15.)

On May 5, 1994, Plaintiff David Bonilla's ("Mr. Bonilla") employer, Dennis Construction Company of Yuma, Inc., applied to the Upper Midwest Group Trust for employee life insurance, accidental death and dismemberment insurance, and health insurance. (Def.'s SOF in Supp. of Mot. for Summ. J. ("Def.'s SOF # 1") [Doc. No. 17] Ex. 1.) The subsequently issued group insurance policy (the "Plan") was underwritten by Defendant Principal Life Insurance Company ("Principal"). (*Id.*) The Plan is part of an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (*See* Order of 12/13/00 [Doc. No. 42] at 5–11.)

On February 20, 1998, Dr. Meyer treated Mrs. Bonilla for her a-fib and noted that she needed a pacemaker. (Def.'s SOF # 2 Ex. 9.) On April 7, 1998, Mrs. Bonilla completed an application for health insurance coverage under the Plan. (*Id.* Ex. 2.) Section C of the application included the following language: "I understand if we are approved for coverage all policy provisions will apply including but not limited to preexisting conditions restriction."[2] (*Id.* at 1.) Section D of the application

included a series of questions. In response to question 11, which inquired about whether she had undergone surgeries and hospitalizations, as well as clinical and outpatient treatments, Mrs. Bonilla responded "yes" and provided the following details: "Irregular heartbeat. 9–90 [through] present. Remaining symptoms or problems. Dr. Henry Meyer. Irregular heartbeat. 9–91[to] still have condition. Dr. Chee." (*Id.* at 2.)

Mrs. Bonilla also responded in the affirmative to question 13(a), which inquired as to whether she had experienced "chest pain or pressure, heart trouble, heart attack, heart murmur, rapid, slow, or irregular heartbeat" in the past ten years. (*Id.*) When she completed the application, Mrs. Bonilla was taking Coumadin, a blood thinner, which requires monthly blood checks by a physician. (Def.'s SOF # 2 Ex. 1 at 10–15.) Mrs. Bonilla's health coverage under the Plan began on June 15, 1998. (*Id.* Ex. 3.) The Bonillas were subsequently provided with a booklet describing rights and benefits under the Plan (the "Booklet"). (*Id.* Ex. 1 at 20.) The Booklet included a section entitled "Preexisting Conditions Restrictions" which indicated that "[a] Preexisting Condition is a sickness or injury for which a person was confined or received treatment or service in the six-month period before becoming insured for Comprehensive Medical Expense Insurance." (Def.'s SOF # 2 Ex. 4 at 66.) In addition, the "Arizona Rider" to the Booklet provided the following:

MEDICAL EXPENSE INSURANCE PREEXISTING CONDITIONS RESTRICTIONS

A Preexisting condition is a sickness or injury for which a person was confined

---

2. Because Mrs. Bonilla did not have health insurance for at least a year prior to April 7, 1998, (Def.'s SOF # 2 Ex. 1 at 18), the Health Insurance Portability & Accountability Act of

1996 did not limit Principal's imposition of the preexisting condition exclusion. *See* 29 U.S.C. § 1181 (1996).

or received treatment or service in the 12–month period before becoming insured for Comprehensive Medical Expense Insurance.

No benefits will be payable for a Preexisting Condition until the date that a person has been insured under this Group Plan for 12 consecutive months (18 consecutive months for Late Entrants); and then benefits will be payable only with respect to days of confinement occurring after that date or to treatment or service received after that date.

(*Id.* at 11 of Addendum.)

In late August or early September 1998, Mrs. Bonilla experienced a frightening irregular heartbeat. (Def.'s SOF # 2 Ex. 1 at 12.) She visited Dr. Meyer and decided to have pacemaker implant surgery (the "Surgery"). (*Id.* at 12–14.) Mrs. Bonilla called Principal to determine if Principal would pay for the surgery, but Principal did not make any commitment. (*Id.* at 25.) On September 2, 1998, Liza, from Cardiac Arrhythmia Associates, called Principal for benefit verification for the Surgery and spoke to Melissa Perkins (formerly Melissa Hill), Benefit Specialist. (*Id.* Ex. 5.) Ms. Perkins explained the Plan's benefit provisions and provided the following disclaimer ("Disclaimer # 1"): "The following information is not a guarantee of payment. I can only verify Patricia Bonilla has been a participant in this group plan. Actual payments will be based on the plan provisions. Do you understand this disclaimer?" (*Id.*) The next day, Sheila from Scripps Hospital called Principal for benefit verifications for the pacemaker implant surgery and spoke to Cindy Dicks, Benefit Specialist, who also explained the benefit provisions and repeated Disclaimer # 1. (*Id.* Ex. 6.)

On September 3, 1998, Liza, from Cardiac Arrhythmia Associates, wrote a letter to Mrs. Bonilla which addressed the logistics of the surgery and stated, "Your insurance company has approved this procedure." (*Id.* Ex. 7.) On September 11, 1998, Mrs. Bonilla underwent the Surgery, (Pls.' Am Compl., [Doc. No. 43] ¶ VIII), and Principal proceeded to pay approximately $11,633.83 of the resultant charges (Def.'s Countercl. [Doc. No. 47] at 5.) Then, on November 6, 1998, Principal sent a letter to Dr. Meyer and other treating physicians requesting copies of Mrs. Bonilla's medical records. (Def.'s SOF # 2 Ex. 8.) Phyllis LoBosco, Senior Claim Examiner, reviewed these records and found that, on February 20, 1998, Dr. Meyer had treated Mrs. B. for a-fib and noted that she "needs [a] pacemaker." (*Id.* Ex. 9.)

Principal completed its review and concluded that Mrs. Bonillas's claim for benefits was precluded by the Preexisting Conditions Restrictions provision of the Plan. (*Id.* Ex. 8.) Principal then sent a letter, dated January 18, 1999, denying the remaining amounts submitted by Mrs. Bonilla's health care providers in connection with the Surgery. This letter quoted the Plan's six-month preexisting condition provision instead of the Arizona Rider's 12–month provision.[3] (*Id.*)

Plaintiffs filed their original Complaint on May 19, 1999. Defendants removed this action to this Court on June 23, 1999, and filed a Motion for Summary Judgment seeking a determination that the Bonillas' claim was governed by ERISA. The Court granted Defendants' motion, and, on January 12, 2001, Plaintiffs filed their Amended Complaint, alleging breach of contract, breach of fiduciary duty, and estoppel.

---

**3.** 29 U.S.C. § 1181(a)(1) (1996) indicates that the preexisting condition exclusion for ERISA plans is limited to 6 months. Hence, the Court will weigh the parties' arguments as they pertain to a 6–month, and not 12–month period of time.

On February 16, 2001, Principal served Counterdefendants David C. Bonilla and Patricia Bonilla (the "Bonillas"), through their attorneys, with Principal's Answer to Amended Complaint and Counterclaim for restitution of $11,633.83 in medical expenses erroneously paid to Mrs. Bonilla's health care providers by Principal. The Court granted the Bonillas' counsel's Motion to Withdraw on March 9, 2001, and the Bonillas proceeded *pro se*. In spite of two extensions of time, the Bonillas failed to reply to the Counterclaim, and the Clerk of the Court entered default against them on the Counterclaim on August 15, 2001. Then, Principal sought judgment against the Bonillas for the sum certain sought in the counterclaim in the amount of $11,633.83, and, on September 21, 2001, the Court entered Judgment on the counterclaim in this amount.

Next, Principal proceeded to depose the Bonillas. After obtaining leave of the Court, on December 21, 2001, Principal filed a Motion for Summary Judgment in which Principal sought dismissal of the Bonilla's Amended Complaint on the grounds that Principal did not abuse its discretion in denying the Bonillas' claim for benefits. Principal stated that the Court should apply a de novo standard of review, but then proceeded to argue its motion under an abuse of discretion standard. Because Principal had skipped an important step in the analysis of this case, the Court denied Principal's Motion for Summary Judgment.

On September 10, 2002, Defendant filed the pending Renewed Motion for Summary Judgment.[4] On September 30, 2002, the Court provided the Bonillas with a warning regarding procedures governing motions practice before the Court and ordered them to respond to Principal's Motion for Summary Judgment no later than October 31, 2002. The Bonillas filed a brief Response to the Renewed Motion for Summary Judgment on October 30, 2002. The Bonillas also sent correspondence to the Court, with a copy to opposing counsel, on September 18, 2002. In this letter, the Bonillas expressed an intent to incorporate their previous "Answer" [Doc. 72], which was filed on January 31, 2002, as a Response to Principal's subsequently denied Motion for Summary Judgment. To avoid confusion, the Court will construe the Bonillas' correspondence, dated September 14, 2002, and received September 18, 2002, as a Supplemental Response to Renewed Motion for Summary Judgement and direct the Clerk of the Court to docket the Bonillas' letter accordingly. The Court will also construe the Bonillas' "Answer"[5] as incorporated by reference pursuant to Local Rule 1.9(e)(2).

### STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (1995); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Substantive law determines which facts are material. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Jesinger,* 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

---

**4.** Principal incorporates its previous Statement of Facts ("Def.'s SOF # 2") [Doc. No. 69] that was filed on December 21, 2001.

**5.** Henceforth, the Court will refer to this document as the "Incorporated Response."

summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Jesinger,* 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see also Citadel Holding Corp. v. Roven,* 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995).

▮▮▮ In an action to recover benefits under an ERISA plan, the courts employ a de novo standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan vests the administrator with such discretionary authority, a district court may review the administrator's decision only for an abuse of discretion. *See id.* Thus, "[d]epending upon the language of an ERISA plan, a district court reviews a plan administrator's decision to deny bene-

fits either *de novo* or for abuse of discretion." *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations,* 244 F.3d 1109, 1112 (9th Cir.2001).

▮▮▮ A determination of the proper standard of review begins with a determination of whether the plain language of the plan conferred discretion on the administrator in making benefits determinations. *See Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir.1995). When the language is ambiguous or uncertain, "the default is that the administrator has no discretion, and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir.1999). Accordingly, if Defendant seeks judicial deference to its decision to deny Plaintiffs' benefits then it must first demonstrate that it has " 'unambiguously retained' " discretion. *Id.* at 1090 (*quoting Bogue v. Ampex Corp.,* 976 F.2d 1319, 1325 (9th Cir.1992)). Because Principal has not shown that the Plan conferred discretion upon its administrator, the Court will apply a de novo standard in reviewing Principal's decision to deny the Bonilla's claim. *See id.* at 1089–90.

**DISCUSSION**

Conceding a de novo standard of review, Principal contends that it is entitled to summary judgment that it properly denied the claim for the Surgery on the basis of a preexisting condition. Principal also contends that it is entitled to summary judgment on the Bonillas' claims for breach of fiduciary duty and estoppel. In their Supplemental Response, the Bonillas argue that Principal has not "provided evidence that it has 'unambiguously retained' discre-

tion." (Pls.' Suppl. Resp. of 9/18/02.) Because the Court is applying a de novo standard of review, the Court finds that the Bonillas' discretion argument is not relevant to the Court's analysis.

## I. Breach of Contract

■ Principal contends that the Plan defines a preexisting condition as "a 'sickness' or 'injury' for which a person was 'confined, or received treatment or service' in the 12–month [6] period before becoming insured." Principal notes that Mrs. Bonilla had been visiting her doctor every month and taking Coumadin for her a-fib since 1990. In addition, on February 20, 1998, about four months prior to Mrs. Bonilla's effective coverage date of June 15, 1998, Dr. Meyer treated Mrs. Bonilla for her a-fib, and noted she "needs [a] pacemaker." (Def.'s SOF # 2 Ex.9.) Principal argues that, hence, Mrs. B's a-fib is a "sickness" for which she received "treatment" or "service" in the excluded preexisting time period before coverage commenced. Principal concludes that the breach of contract claim should, therefore, be dismissed as matter of law.

In their Incorporated Response, the Bonillas claim that, on September 2, 1998, Principal provided the hospital with a pre-authorization number that the hospital relied on in admitting Mrs. Bonilla for the surgery on September 11, 1998. The Bonillas also claim that they relied on the pre-authorization to show that the surgery would be covered by Principal. The Bonillas further contend that the phone number provided by "Barbara," who provided the pre-authorization number, matches the authorization phone number under "For Au-

thorization call:" on the back of the Bonillas' insurance card.

To support their contentions, the Bonillas provide several exhibits, including a purported letter, dated 3/4/98, to Mrs. Bonilla from Liza at Cardiac Arrhythmia Associates, a purported hospital admission sheet, and purported copies of the back of the Bonillas' insurance card. (Pls.' Inc. Resp. [Doc. No. 72] Ex. A.) The Bonillas do not provide any affidavits or testimony identifying the attached documents. However, construing the documents in the best possible light, the Court finds the documents do not establish a question of fact. First, the letter [7] refers to a procedure scheduled for March 9, 1998, which is well before Mrs. Bonilla's effective coverage date of June 15, 1998. (Id. at 1.) Second, the Bonillas base their arguments on unidentified handwritten notes at the bottom of the letter. (See id.) Even if these notes were made by the supposed author, Liza, they merely provide (1) a precertification number, which matches the authorization number on the purported hospital admission sheet, and (2) a telephone number for Barbara, which matches the authorization information number on the purported insurance card. (Id.)

The Bonillas have not provided any admissible evidence to show that hospital relied on the pre-authorization information in conducting the surgery. Nor have they shown why such reliance, even if it existed, is relevant to their claims. In their most recent Response, the Bonillas apparently attempt to cure some of the deficiencies in their Incorporated Response by providing an affidavit signed by Mr. Bonilla and Mrs. Bonilla. (Pls.' Resp. to Renewed Mot. for

---

6. As noted, *supra,* the Court will apply a six-month period in resolving this Motion.

7. In fact, if the letter were to be deemed admissible, it actually bolsters the finding that

Mrs. Bonilla was indeed treated for a cardiac condition during the six months prior to her enrollment in the Plan.

Summ. J. [Doc. No. 80].) In this affidavit, the Bonillas assert that "[t]he Bonillas, the hospital and surgeon all relied on this pre-authorization in admitting Patricia Bonilla and going forward with the surgery." (*Id.* ¶ 5.) Although this affidavit does suffice as admissible evidence in support of the Bonillas' contention that they relied on the pre-authorization in proceeding with the surgery, it is not admissible evidence as to what the hospital and surgeon relied upon. Moreover, the Bonillas have failed to provide controlling authority to support their argument that their reliance on the provision of a pre-authorization number supercedes the clear language of the Plan.

██ The fact that Mrs. Bonilla received treatment for her a-fib during the 6–month period before becoming insured and that her treating physician indicated that she needed a pacemaker is uncontroverted. (Def.'s SOF # 2 Ex. 9.) The Bonillas' argument that they "relied on this authorization to confirm that this procedure would be covered" (Pls.' Inc. Resp. at 2:16) appears to be an attempt to argue that their reasonable expectations have been thwarted. As Principal notes, the Ninth Circuit has "adopt[ed] the doctrine of reasonable expectations as a principle of the uniform federal common law informing interpretation of ERISA-governed insurance contracts." *Saltarelli v. Bob Baker Group Med. Trust,* 35 F.3d 382, 387 (9th Cir. 1994). However, the doctrine does not apply when a provider makes "its exclusionary clauses conspicuous, plain and clear." *Winters v. Costco Wholesale Corp.,* 49 F.3d 550, 555 (9th Cir.1995).

The Bonillas do not contend that the preexisting condition clause was hidden or obscure. In fact, Mrs. Bonilla has even acknowledged that she read the section of the Booklet describing the Preexisting Conditions Restrictions. (Def.'s SOF # 2

Ex. 1 at 20.) Furthermore, the provision is listed on the first page of the table of contents, (*Id.* Ex. 4 at GH 101), and Mrs. Bonilla signed the Authorization and Acknowledgment, which also cited the provision (*id.* Ex. 2 at 1). Hence, the Court finds "that there is no evidence in the record upon which a reasonable trier of fact could find an objective, reasonable expectation of coverage on the part of the [Bonillas]." *Winters,* 49 F.3d at 555.

In their Incorporated Response, the Bonillas rely on *Henry v. Home Ins. Co.,* 907 F.Supp. 1392 (C.D.Cal.1995) to support their reasonable expectations argument. (Pls.' Suppl. Resp. at 3.) In *Henry,* the Court found that the insurer had buried an explanatory clause, thereby thwarting the reasonable expectations of the insured. 907 F.Supp. at 1396–97. As previously noted, no such concealment has been shown in the present instance. Accordingly, the Court finds that the Bonillas have failed to establish a genuine issue of material fact regarding Principal's alleged breach of contract. Therefore, the Court will dispose of Count I.

## II. Breach of Fiduciary Duty

Principal also contends that the Bonillas' claim for breach of fiduciary duty fails as a matter of law because the Bonillas have an adequate remedy under their breach of contract claim which seeks ERISA benefits pursuant to 29 U.S.C. § 1132(a)(1). In their Incorporated Response, the Bonillas posit that "ERISA S 502(a)(3) [8] allows an action to obtain equitable relief." (Pls.' Suppl. Resp. at 3.) However, the Bonillas do not provide any reason as to why they are entitled to such equitable relief. The Bonillas also do not address the fiduciary duty claim in their Response or Supplemental Response.

8. This provision is codified at 29 U.S.C. § 1132(a)(3).

In Count II, the Bonillas allege that Principal violated 29 U.S.C. §§ 1104 and 1132(a)(3) by pre-authorizing coverage and then denying coverage and by improperly denying payment. (Am. Compl. at 6.) In assessing this count, the Court will consider the specific statutes cited by the Bonillas. First, § 1104 provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1) (1996). However, as Principal notes, this section does not create an additional remedy pursuant to the ERISA scheme. *See* 29 U.S.C. § 1104. In addition the Bonillas have not presented any facts or legal authority supporting a finding that Principal violated § 1104. Hence, the Court will dispose of Count II to the extent that it relies on § 1104.

Next, § 1132(a) provides that "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary ... to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (1997). In Count II, the Bonillas claim to "have suffered damages and a denial of benefits." (Pls.' Am. Compl. ¶ XVII.) Because the Bonillas have not provided any additional clarification in their Response, Supplemental Response, and Incorporated Response, the Court finds that the Bonillas have not stated a claim for "equitable relief" as provided by § 1132(a)(3).

In addition, courts have repeatedly held that a plaintiff may not pursue a remedy pursuant to § 1132(a)(3) when another ERISA provision provides adequate relief. *See, e.g., Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 1079, 134 L.Ed.2d 130 (1996) (permitting plaintiffs to pursue equitable relief only because plaintiffs could not proceed under other ERISA provisions); *Forsyth v. Humana,* 114 F.3d 1467, 1475 (9th Cir.1997) ("Equitable relief

under section 1132(a)(3) is not 'appropriate' because section 1132(a)(1) provides an adequate remedy in this case.") *aff'd,* 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999). Section 1132(a) clearly provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B) (1997). In their Amended Complaint, the Bonillas seek damages consisting of payment by Principal of the medical expenses incurred by Mrs. Bonilla in connection with the Surgery. (Pls.' Am Compl. ¶ XXI.) Such damages clearly fall under the rubric of "recover[ing] benefits due ... under the terms of [the][P]lan." 29 U.S.C. § 1132(a)(1)(B). Hence, the Court finds that § 1132(a)(1)(B) provides the relief sought by the Bonillas. Therefore, the Bonillas are precluded from pursuing a remedy available under § 1132(a)(3). See *Varity,* 516 U.S. at 515, 116 S.Ct. at 1079; *Forsyth,* 114 F.3d at 1475.

### III. Estoppel

Principal further argues that it is entitled to summary judgment on Count III because the Bonillas have failed to state a claim for estoppel. As Principal acknowledges, in *Spink v. Lockheed Corp.,* the Ninth Circuit set out the following elements which a plaintiff must prove to show "equitable estoppel in an ERISA action":

[1]  a material misrepresentation,

[2]  reasonable and detrimental reliance upon the representation,

[3]  extraordinary circumstances,

[4]  that the provisions of the plan at issue were ambiguous such that reasonable persons could disagree as to their meaning or effect, and ...

[5]  that representations were made involving an oral interpretation of the plan.

125 F.3d 1257, 1262 (9th Cir.1997) (*citing Pisciotta v. Teledyne Indus., Inc.* 91 F.3d 1326, 1331 (9th Cir.1996)). Principal argues that the Bonillas have not established these requisite elements. For example, Principal contends that the Bonillas cannot prove that Principal made a material misrepresentation because the Bonillas concede that (1) no representation was made by Principal to them regarding coverage for the pacemaker implant surgery (Def.'s SOF # 2 Ex. 1 at 25) and (2) they believed that Mrs. Bonilla's claim would be covered was based on the September 3, 1998, letter from Dr. Meyer's office (*id.* at 37).

Principal also argues that Mrs. Bonilla's testimony that she would have had the surgery regardless of whether it was covered (*id.* at 24–25) belies the existence of reasonable and detrimental reliance upon any representation. Principal further contends that the Plan's provisions are not ambiguous because the Preexisting Conditions Restrictions clause was abundantly clear, (*id.* Ex. 4 at 66), and Mrs. Bonilla acknowledged as much by testifying that she read the clause and questioned whether the surgery would be covered (*id.* Ex. 1 at 23). Additionally, in their Response, the Bonillas state that "No 'Disclaimer' was given to the Bonillas regarding possible denial of coverage until after the surgery when the insurance company had paid for certain medical bills and then decided to deny the claim." (Pls.' Resp. ¶ 6.) However, they provide no authority indicating that such a disclaimer was required or even warranted.

In their myriad of responses, the Bonillas appear to argue that Principal's provision of a pre-authorization number warrants the application of estoppel. The Bonillas state that they "requested pre-approval of the recommended surgical procedure." (*Id.* ¶ 2.) However, the Record reflects that when Mrs. Bonilla called Principal to determine if Principal would pay for the surgery, Principal did not make any commitment. (Def.'s SOF # 2 Ex. 1 at 25.) The Bonillas also state that (1) Mrs. Bonilla "disclosed all medical conditions and diagnoses on her application for insurance" (Pls.' Resp. ¶ 2) and (2) an employee of Principal provided a pre-authorizations number for Mrs. Bonilla's heart surgery (*id.* ¶ 4). However, the Bonillas provide no basis for the Court to find that Principal's provision of a pre-authorization number indicated that Principal had already assessed the implications of Mrs. Bonilla's disclosed, preexisting condition. In addition, neither the questionnaire (Def.'s SOF # 2 Ex. 2 at 2) nor Disclaimer # 1 (*id.* Ex. 5) support such a finding.

The Bonillas also have not shown that providing a pre-authorization number constitutes a material misrepresentation. In fact, courts addressing the impact of pre-authorization numbers on subsequent denials have reached the opposite conclusion. For example, in *Kracht v. Aalfs Associates H.C.P.,* the Court found that an ERISA plan's administrator's decision to deny benefits to an individual who had followed the plan's preadmission certification procedure, on the basis that the individual's expenses were related to his preexisting condition, did not constitute an inconsistent interpretation of the plan's provisions regarding pre-certification and preexisting conditions. 905 F.Supp. 604, 618 (N.D.Iowa 1995). In *England v. John Alden Life Ins. Co.,* the court found that an ERISA insurer's denial, based on a preexisting condition, of coverage for charges incurred for pre-certified hospitalizations did not constitute breach of fiduciary duty because the certifications did not guarantee payment. 846 F.Supp. 798, 801 (W.D.Mo.1994).

Similarly, in the present instance, Principal has shown that its certifications did not guarantee payment. In fact, by pro-

viding Disclaimer # 1, Principal explicitly disavowed such a guarantee. (Def.'s SOF # 2 Exs. 5, 6.) Hence, even if the Bonillas did rely on the pre-authorization number, they have not shown that their reliance was reasonable. *See Spink,* 125 F.3d at 1262. In addition, the Bonillas have not shown extraordinary circumstances or ambiguity regarding the provisions of the Plan. *See id.* Nor have the Bonillas shown that Principal made representations regarding an oral interpretation of the Plan. *See id.* Hence, the Court finds that the Bonillas have failed to establish a question of fact regarding their estoppel claim, and the Court will grant summary judgment on this claim, thereby disposing of the entire Amended Complaint.

### CONCLUSION

**IT IS ORDERED** that to avoid confusion, the Court will construe the Bonillas' correspondence, dated September 14, 2002, and received September 18, 2002, as a Supplemental Response to Renewed Motion for Summary Judgement. The Clerk of the Court is directed to docket the Bonillas' letter accordingly.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 76] is **GRANTED.** The Clerk of the Court is directed to enter Judgment in favor of Defendant Principal Financial Group, thereby terminating this case.